UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------- X

THE CITY OF NEW YORK,

                                      Plaintiff,

                   -against-

BERETTA U.S.A. CORP.; BROWNING ARMS CO.;
CHARCO 2000, INC.; COLT'S MANUFACTURING.
CO., INC.; FORJAS TAURUS, S.A.; GLOCK INC.;
GLOCK GmbH; PHOENIX ARMS; SIGARMS, INC.;
SIG ARMS SAUER GMBH f/k/a J. P. SAUER & SOHN
INC.; SMITH & WESSON CORP.; STURM, RUGER
AND CO., INC.; TANFOGLIO FRATELLI S.R.L.;
TAURUS INTERNATIONAL MFG, INC.; ACUSPORT
CORPORATION; ALAMO LEATHER GOODS, INC.;
BANGERS, L.P.; BILL HICK'S AND COMPANY, LTD.;
BRAZAS SPORTING ARMS, INC.; CAMFOUR, INC.;
CHATTANOOGA SHOOTING SUPPLIES, INC.;
DAVIDSON'S SUPPLY COMPANY, INC.; DIXIE
SHOOTERS SUPPLY, INC.; ELLETT BROTHERS,
INC.; EUCLID AVENUE SALES CO.; FABER
BROTHERS, INC.; GLEN ZANDERS FUR AND
SPORTING GOODS, CO.; HICKS, INC.; KIESLER
POLICE SUPPLY, INC.; LEW HORTON
DISTRIBUTING COMPANY, INC.; LIPSEY'S, INC.;
MKS SUPPLY, INC.; RILEY'S , INC.; RON SHIRK'S
SHOOTERS SUPPLY, INC.; RSR GROUP, INC.; SCOTT
WHOLESALE COMPANY, INC.; SOUTHERN OHIO
GUN, INC.; SPORTS SOUTH, INC.; VALOR
CORPORATION; WALTER CRAIG, INC.; AND
WILLIAMS SHOOTERS SUPPLY,

                                Defendants.

------------------------------------------------------------------------- X

**SECOND AMENDED
COMPLAINT**

00 CV 3641 (JBW) (CLP)

      Plaintiff, the City of New York (the "City"), for its complaint against the defendants,

alleges upon personal knowledge as to itself and upon information and belief as to all other

matters, as follows:

## Preliminary Statement

1.      This is a civil action seeking injunctive relief and abatement of the public nuisance that defendants cause, contribute to and maintain by their marketing and distribution practices.

2.      A public nuisance exists in New York in the form of widespread access to illegal firearms, causing harm to the population at large by endangering and injuring the lives, property, health, safety or comfort of a considerable number of persons.

3.      All of the defendants manufacture and/or distribute firearms that were possessed or used illegally in New York City.

4.      Because virtually every gun used in a crime starts off as a legal firearm, it is evident that guns manufactured by defendant gun manufacturers and distributed by defendant gun distributors are diverted into an illegal gun market catering to juveniles, criminals and other persons prohibited from owning guns.

5.      That diversion is a result of defendants' failure to institute appropriate marketing and distribution practices.

6.      Defendants have reason to know or should know that (a) some of the firearms they manufacture and/or distribute will be diverted into the hands of those who would violate the law, and (b) they could take steps to reduce the number of firearms that fall into the hands of criminals by changing their merchandising practices.

7.      Reasonable measures are available to ensure that the guns sold and distributed by defendants do not find their way into a secondary illegal market.

8.      Defendants could, but do not, monitor, supervise or regulate the sale and distribution of their guns by their downstream distributors or dealer-customers.  Defendants

could, but do not, monitor, supervise or train distributors or dealers to avoid sales that feed the illegal secondary market.  Defendants make no effort to determine those distributors and dealers whose sales disproportionately supply the illegal secondary market.

9.      Residents of the City of New York are exposed to death and injury from firearms. The extent of that exposure would be reduced in New York if defendants followed more prudent merchandising policies.

10.     Defendants' sales and distribution practices accordingly cause, contribute to and maintain a public nuisance consisting of a large and ready supply of guns purchased by criminals and used in the commission of crimes.

11.     The City seeks injunctive relief requiring defendants to adopt reasonable measures that will reduce the movement of their products into the illegal secondary market, thereby abating the public nuisance.

## Jurisdiction and Venue

12.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000.00, exclusive of interest and costs, and the action is between citizens of different States and/or citizens of foreign States.

13.     Venue is proper pursuant to 28 U.S.C. § 1391(a) in that a substantial part of the events or omissions giving rise to this claim occurred in this district.

## The Parties

14.     Plaintiff The City of New York ("the City") was and is a municipal corporation existing by and under the laws of the State of New York.

### Manufacturer Defendants

15.     Defendant Beretta U.S.A. Corp. is a corporation organized and existing under the laws of the State of Maryland with its principal place of business in Maryland.  At all times

relevant to this action, Beretta U.S.A. Corp. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

16.     Defendant Browning Arms Co. is a corporation organized and existing under the laws of the State of Utah with its principal place of business in Utah.  At all times relevant to this action, Browning Arms Co. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

17.     Defendant Charco 2000, Inc. is a corporation organized and existing under the laws of the State of Connecticut with its principal place of business in Connecticut.  At all times relevant to this action, Charco 2000, Inc. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

18.     Defendant Colt's Manufacturing Co., Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Connecticut.  At all times relevant to this action, Colt's Manufacturing Co., Inc. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

19.     Defendant Forjas Taurus, S.A. is a corporation organized and existing under the laws of the nation of Brazil with its principal place of business in Brazil.  At all times relevant to this action, Forjas Taurus, S.A. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

20.     Defendant Glock, Inc. is a corporation organized and existing under the laws of the State of Georgia with its principal place of business in Georgia.  At all times relevant to this action, Glock, Inc. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

21.     Defendant Glock GmbH is a corporation organized and existing under the laws of the nation of Austria with its principal place of business in Austria.  At all times relevant to this action, Glock GmbH manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

22.     Defendant Phoenix Arms is a corporation organized and existing under the laws of the State of California with its principal place of business in California.  At all times relevant to this action, Phoenix Arms manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

23.     Defendant Sigarms, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in New Hampshire.  At all times relevant to this action, Sigarms, Inc. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

24.     Defendant Sig Arms Sauer GmbH, f/k/a J. P. Sauer & Sohn Inc., is a corporation organized and existing under the laws of the nation of Germany with its principal place of business in Germany.  At all times relevant to this action, Sig Arms Sauer GmbH, f/k/a J. P.

Sauer & Sohn Inc. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

25.     Defendant Smith & Wesson Corp. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Massachusetts.   At all times relevant to this action, Smith & Wesson Corp. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

26.     Defendant Sturm, Ruger & Co., Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Connecticut.  At all times relevant to this action, Sturm, Ruger & Co., Inc. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

27.     Defendant Tanfoglio Fratelli S.r.l. is a corporation organized and existing under the laws of the nation of Italy with its principal place of business in Italy.  At all times relevant to this action, Tanfoglio Fratelli S.r.l. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United States, and which were distributed, marketed, sold and/or possessed within the City of New York.

28.     Defendant Taurus International Manufacturing, Inc. is a corporation organized and existing under the laws of the State of Florida with its principal place of business in Florida. At all times relevant to this action, Taurus International Manufacturing, Inc. manufactured, assembled and/or imported guns which were marketed, distributed and/or sold in the United

States, and which were distributed, marketed, sold and/or possessed within the City of New York.

Distributor Defendants

29.     Defendant Acusport Corporation is a corporation organized and existing under the laws of the State of Ohio with its principal place of business in Ohio. At all times relevant to this action, Acusport Corporation marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

30.     Defendant Alamo Leather Goods, Inc. is a corporation organized and existing under the laws of the State of Texas with its principal place of business in Texas. At all times relevant to this action, Alamo Leather Goods, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

31.     Defendant Bangers, L.P. is a limited partnership organized and existing under the laws of the State of Alabama with its principal place of business in Alabama. At all times relevant to this action, Bangers, L.P. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

32.     Defendant Bill Hick's and Company, Ltd. is a corporation organized and existing under the laws of the State of Minnesota with its principal place of business in Minnesota. At all times relevant to this action, Bill Hick's and Company, Ltd. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

33.     Defendant Brazas Sporting Arms, Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in

Massachusetts.  At all times relevant to this action, Brazas Sporting Arms, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

34.    Defendant Camfour, Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Massachusetts.  At all times relevant to this action, Camfour, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

35.    Defendant Chattanooga Shooting Supplies, Inc. is a corporation organized and existing under the laws of the State of Tennessee with its principal place of business in Tennessee.  At all times relevant to this action, Chattanooga Shooting Supplies, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

36.    Defendant Davidson's Supply Company, Inc. is a corporation organized and existing under the laws of the State of Arizona with its principal place of business in Arizona.  At all times relevant to this action, Davidson's Supply Company, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

37.    Defendant Dixie Shooters Supply, Inc. is a corporation organized and existing under the laws of the State of Arizona with its principal place of business in Arizona.  At all times relevant to this action, Dixie Shooters Supply, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

38.     Defendant Ellett Brothers, Inc. is a corporation organized and existing under the laws of the State of South Carolina with its principal place of business in South Carolina.  At all times relevant to this action, Ellett Brothers, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

39.     Defendant Euclid Avenue Sales Co. is a business organized and existing under the laws of the State of Georgia with its principal place of business in Georgia.  At all times relevant to this action, Euclid Avenue Sales Co. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

40.     Defendant Faber Brothers, Inc. is a corporation organized and existing under the laws of the State of Illinois with its principal place of business in Illinois.  At all times relevant to this action, Faber Brothers, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

41.     Defendant Glen Zanders Fur and Sporting Goods, Co. is a business organized and existing under the laws of the State of Illinois with its principal place of business in Illinois.  At all times relevant to this action, Glen Zanders Fur and Sporting Goods, Co. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

42.     Defendant Hicks, Inc. is a corporation organized and existing under the laws of the State of Alabama with its principal place of business in Alabama.  At all times relevant to this action, Hicks, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

43.     Defendant Kiesler Police Supply, Inc. is a corporation organized and existing under the laws of the State of Indiana with its principal place of business in Indiana. At all times relevant to this action, Kiesler Police Supply, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

44.     Defendant Lew Horton Distributing Company, Inc. is a corporation organized and existing under the laws of the Commonwealth of Massachusetts with its principal place of business in Massachusetts. At all times relevant to this action, Lew Horton Distributing Company, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

45.     Defendant Lipsey's, Inc. is a corporation organized and existing under the laws of the State of Louisiana with its principal place of business in Louisiana. At all times relevant to this action, Lipsey's, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

46.     Defendant MKS Supply, Inc. is a corporation organized and existing under the laws of the State of Ohio with its principal place of business in Ohio. At all times relevant to this action, MKS Supply, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

47.     Defendant Riley's, Inc. is a corporation organized and existing under the laws of the State of Indiana with its principal place of business in Indiana. At all times relevant to this action, Riley's, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

48.     Defendant Ron Shirk's Shooters Supply, Inc. is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business in Pennsylvania. At all times relevant to this action, Ron Shirk's Shooters Supply, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

49.     Defendant RSR Group, Inc. is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Florida. At all times relevant to this action, RSR Group, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

50.     Defendant Scott Wholesale Company, Inc. is a corporation organized and existing under the laws of the State of North Carolina with its principal place of business in North Carolina. At all times relevant to this action, Scott Wholesale Company, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

51.     Defendant Southern Ohio Gun, Inc. is a corporation organized and existing under the laws of the State of Ohio with its principal place of business in Ohio. At all times relevant to this action, Southern Ohio Gun, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

52.     Defendant Sports South, Inc. is a corporation organized and existing under the laws of the State of Louisiana with its principal place of business in Louisiana. At all times relevant to this action, Sports South, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

53.     Defendant Valor Corporation is a corporation organized and existing under the laws of the State of Florida with its principal place of business in Florida.  At all times relevant to this action, Valor Corporation marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

54.     Defendant Walter Craig, Inc. is a corporation organized and existing under the laws of the State of Alabama with its principal place of business in Alabama.  At all times relevant to this action, Walter Craig, Inc. marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

55.     Defendant Williams Shooters Supply is a business organized and existing under the laws of the State of Illinois with its principal place of business in Illinois.  At all times relevant to this action, Williams Shooters Supply marketed, distributed and/or sold handguns in the United States, which were distributed, marketed, sold and/or possessed within the City of New York.

## Facts

### Firearms Violence in the United States and the State and City of New York

56.     The United States leads the world in the number of people and in the number of children who die and are injured each year by guns.  The yearly toll of several thousand persons killed compares to no more than a few hundred per year in every other industrialized country.  A teenager in the United States is more likely to die from a gunshot wound than from all natural causes combined.

57.     New York City strictly limits the people who may possess guns within the City. In accord with the long-standing recognition that the number of deaths and injuries in a particular locality is related to the availability of guns, New York City has enacted comprehensive gun

laws intended to keep guns out of the hands of juveniles and criminals. The City's laws, among other things, prohibit the possession of firearms without a license; prohibit possession by certain persons, including those previously convicted of a felony, those with mental disorders, and anyone under the age of 21; prohibit the selling of firearms without safety locking devices and written warnings regarding safe firearm storage; require that licensees not purchase handguns without prior written authorization from the New York City Police Department; require written request of the Police Department to purchase more than one gun; and require notice to the Police Department when an owner sells his gun. 38 RCNY §3-01 to 38 RCNY § 5- 33.

58.   Despite the City's efforts, persons legally prohibited from owning firearms and those without the requisite New York or New York City license are able to obtain, possess and use illegal firearms in New York City. Firearms are by far the preferred method of murder in New York City, and are used in approximately 60% of the murders committed each year. In 1996, 652 people were murdered with a firearm in New York City; in 1997, 465 were murdered with guns; in 1998, 375; and in 1999, 391. Approximately double the number of persons are injured by the criminal use of firearms, with over 2,000 criminal shooting victims reported each year in New York City.

59.   Firearms are also used in connection with many crimes other than murder. In 1998, for example, of the 39,358 reported robberies in the City, 7,640 or approximately 20% involved the use of a firearm. In that same year, of the 2,181 reported felony reckless endangerment cases, 23% involved the use of a firearm and 20% of menacing cases also involved the use of a firearm. These figures are typical of more recent years.

60.   In the period from August 1, 1997 through July 31, 1998, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), through its National Firearms

Tracing Database (the "Trace Database"), traced 8,437 guns used in crimes in New York City. The 8,437 crime guns traced were used in the commission of 433 robberies, 309 assaults/threats, 278 homicides, 143 narcotics crimes, 101 burglaries/thefts/frauds, and 7,123 firearms-related offenses.

61.     Of the 8,437 guns traced, 618 were used in crimes committed by juveniles age 17 and under.

62.     Defendants manufactured or distributed a large number of guns recovered in crimes committed in New York City and New York State.  According to ATF trace data for the last five years, thousands of guns manufactured or distributed by defendants were used to commit crimes in the City of New York.  This number includes only guns that were recovered in the course of a crime.  The actual number of defendants' "crime guns" used in New York City over the last five years is vastly higher.

### The Primary and Secondary Market for Guns

63.     The firearms market consists of a primary and a secondary market.

64.     The primary market consists of transactions through which new firearms move from manufacturers or importers through distributors and retailers to a first retail purchaser.

65.     Although there is a legitimate secondary market for firearms, that market also includes an illegal segment made up of private transactions among non-federally licensed individuals.

66.     The illegal, secondary market is a significant source of firearms to criminals. Most firearms acquired by criminals are acquired through transactions in the secondary market.

67.     Criminals are an important market segment for the gun industry. Recent analyses have shown that 11% of handguns sold between 1996 and 2000 were used in violent crimes by

the year 2000; 18% of handguns sold in the year 1990 were in the hands of violent criminals or used in violent crimes by the year 2000.

68.     Recent analyses have shown that guns move quickly from the legal to the illegal market; 13% of guns recovered in crimes were recovered within one year of their sale, and 30% were recovered within 3 years of their first sale.  ATF trace data indicates that as many as 43% of guns used in crimes in urban centers across the United States were purchased from retail dealers less than three years prior to commission of the crime.  A relatively short interval between the retail sale of a gun and its recovery in a crime is an accepted indicator that a party to the initial retail transaction intended to transfer the gun to a prohibited user or into the illegal market.

69.     The firearm trafficking investigations of the New York Police Department-ATF Joint Firearm Task Force also indicate that most of the guns purchased in the secondary market were relatively new. Many times the task force members bought brand new guns, many of them still in original boxes with manuals and gun cleaning paraphernalia.  The guns seized and investigated almost invariably did not come from retail sources in the City of New York, but came from out-of-state.  Few of the guns recovered had been diverted into the illegal market through theft.  Firearms can be obtained easily in New York City in the secondary market despite prices that are often two to three times the price charged by legitimate dealers.

### Diversion to the Illegal Market

70.     Diversion of guns from the primary, legal market to the illegal, secondary market is caused in large part through defendants' marketing practices.

71.     Defendants are aware that many guns that they sell, directly or indirectly, to retail dealers find their way into the secondary market through specific sales practices by gun dealers.

72.     Defendants have failed to prevent diversion to the illegal market by, inter alia, failing to:  monitor corrupt dealers; require retail sales only through storefront establishments;

limit sales made at gun shows; prohibit straw purchases by dealers; limit multiple sales; and limit sales to dealers in states with lax gun laws.

### Illegal Sales at Gun Shows

73.     Gun shows are a significant source of guns that fall into the hands of criminals. Sales at gun shows by non-licensed persons to private citizens fall outside the three-tier process of the sale of a new firearm from a manufacturer through a distributor and dealer to a first retail purchaser. This constitutes a loophole for guns to be supplied to criminals, and defendants are aware of this loophole.

74.     Although a Federal Firearms Licensee ("FFL") selling at a gun show must comply with the same regulations that apply for a sale at a business establishment, FFLs circumvent that rule in practice. Defendants are aware that FFL's selling at gun shows circumvent that rule.

75.     Firearms manufactured, imported or distributed by defendants that have been acquired at gun shows are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City of New York.

### Private Sellers and Other Non-Storefront Sales

76.     The law does not require private sellers of firearms – so-called "non-stocking" or "kitchen-table" dealers who are not "engaged in the business" of selling firearms and who do not operate from a storefront – to conduct background checks or to maintain records that an FFL is required to maintain.  This constitutes a loophole for diversion of guns to criminal elements, and defendants are aware of this loophole.

77.     Defendants could sharply limit or eliminate sales by non-stocking, or kitchen-table dealers through the use of prudent merchandising practices at little cost or loss of business.

78.     Firearms that defendants have sold through non-stocking or kitchen table dealers are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City of New York.

### Straw Purchases

79.     Straw purchases, wherein the purchaser buys the gun from a licensed dealer for a person who is not qualified to purchase the firearm under federal and state regulations, are a source of firearms for the secondary market.  In one recent law enforcement study, more than 50% of the firearms subject to firearm trafficking investigations had been acquired as part of a straw purchase.   The circumstances of many of these purchases indicated or should have indicated to the firearms sellers that they were "straw purchases."

80.     A seller who knowingly makes a sale to someone who is a straw purchaser conducts an illegal transaction and therefore commits a felony.  Defendants are aware that this law does not deter a substantial number of sellers from engaging in straw purchases.

81.     Defendants could sharply limit straw sales by regulating their own customers through the use of prudent merchandising practices.  This result could be achieved at little cost or loss of business.

82.     A substantial number of firearms manufactured, imported or distributed by defendants were acquired by a straw purchase, diverted to the secondary market in New York City, and used to cause injury, death or the threat thereof to residents of the City of New York.

### Multiple Sales

83.     Guns are diverted to the illegal gun market after being sold as part of a "multiple sale," in which the purchaser buys more than one gun at the same time or over a limited time period from a licensed dealer with the intention of later transferring the guns to persons

unqualified to purchase under federal and state gun laws. Large multiple sales to one person by a single FFL are a further source of firearms for the secondary market.

84.     Firearms manufactured, imported or distributed by defendants are acquired as part of a multiple purchase, diverted to the illegal market in New York, and used to cause injury, death or the threat thereof to residents of the City of New York.

### Corrupt FFLs

85.     Guns acquired by criminals can be obtained through intentional trafficking by an FFL. Defendants are aware that some FFLs are corrupt and that they should not do business with such dealers, but defendants nevertheless continue selling to such dealers until ATF revokes the dealers' licenses, which often takes years.

86.     Guns are diverted to the illegitimate gun market through corrupt dealers. According to a recent ATF study, just 1.2% of dealers accounted for over 57% of the crime guns traced to current dealers in 1998. For example, in 1998, just over 450 licensed dealers had ten or more crime guns with a time-to-crime of three years or less traced to them. In addition, a congressional study of ATF data found that an extraordinary proportion of crime guns were purchased from the same "high crime" gun dealers. The same 137 dealers were the source of more than 34,000 crime guns between 1996 and 1998.

### Other Means of Diversion

87.     Guns manufactured, imported or distributed by defendants are stolen from FFLs with poor security arrangements, and FFLs falsely report thefts to conceal trafficking. These guns are diverted to the secondary market in New York, and used to cause injury, death or the threat thereof to residents of the City of New York.

88.     Some manufacturer or distributor defendants sell guns in states where gun regulations are lax. These manufacturers and distributors know or should know that the guns

would be taken into New York City to be used illegally.  Defendants produce, market and distribute substantially more handguns than they reasonably expect to sell to law-abiding purchasers.  They oversupply states with weak handgun controls and restrictions, such as certain southern states along the I-95 corridor, with substantially more handguns than they know or should know will be purchased by legitimate purchasers in those states.  Defendants do so with the knowledge that the oversupply will be sold to prohibited purchasers in states, counties and cities, like New York City, which have strong restrictions on the purchase and ownership of firearms. Guns are diverted to the illegal market through sales in states with weak gun control laws to persons who transport the guns to places with strict gun control laws, such as New York City, a fact confirmed by recent ATF data indicating that over 84% of the crime guns recovered in New York City come from out of state.  Of these crime guns, the top source states were Virginia (414), Florida (329), Georgia (282), North Carolina (268), South Carolina (224), Pennsylvania (159), Ohio (136), Alabama (106) and Texas (99).

89.     Handguns manufactured, imported or distributed by defendants are acquired in states and cities where gun regulations are lax, diverted to the illegal market in New York, and used to cause injury, death or the threat thereof to residents of the City of New York.

### The Trace Database

90.     An ATF gun "trace" identifies (a) the FFL that initially sold a gun recovered at a crime scene, (b) the manufacturer of the gun, and (c) the initial gun purchaser.  The Trace Database traces a gun through the primary market, namely from the gun manufacturer or importer, distributor and retail dealer to the first retail purchaser.  Defendants are an integral part of the tracing system because they receive requests for gun traces from ATF and other local law enforcement agencies.

91.    The gun traces contained in the Trace Database overwhelmingly involve guns recovered in connection with a crime.

92.    There is a statistically significant relationship between the number of homicides in various states and the number of dealers with firearms traced in those states.

93.    By receiving trace requests from the ATF, manufacturers and distributors learn that guns sold by them were involved in crimes and can easily determine which specific retail dealers sold the guns.

94.    Although trace data does not provide manufacturers and distributors with all conceivable information about a particular trace, when a disproportionate number of traces is attributable to a particular retailer, a prudent manufacturer or distributor has the ability to ensure that its guns are not falling into criminals' hands through lax practices by that retailer. Excessive numbers of traces to specific retailers or first purchasers can serve as a cause for concern by the manufacturers and distributors, who are not foreclosed from closing off illegal flows of their guns to such retailers. Defendants can take steps based on trace leads without interfering with or endangering law enforcement personnel.

95.    Although an FFL with a large number of sales may for that reason have a larger number of traces, data from the Trace Database has established that for many dealers, the number of traces is much larger than would be predicated from sales volume alone. Although a large number of traces is not itself proof of wrongdoing by the FFL, there is nothing to prevent defendants from investigating whether volume alone accounts for the traces.

96.    Although an FFL with a large number of traces would be an appropriate target for an ATF investigation, defendants are not thereby foreclosed from using ATF data to develop more prudent merchandising practices.

97.     There is no ATF position or pronouncement that would preclude defendants from using the elements of trace data available to them to institute more prudent merchandising practices to reduce the numbers of guns obtained from their retail dealers by criminals for use in crimes.

98.     Responsible merchandising using trace data available to defendants would not interfere with pending or prospective law enforcement proceedings and there is nothing inconsistent between ATF's efforts and use of the data by defendants to reduce the flow of their firearms to criminal elements.

99.     There are indicators other than amount of sales that predict that a dealer's guns are more likely to end up in the hands of criminals. Some indicators are: (1) out of state traces; (2) obliterated serial number traces; (3) multiple traces for the same purchaser; (4) multiple traces for the same purchaser and same dealer; (4) multiple sales forms; (5) traces from multiple sales; (6) record keeping problems; (7) multiple licenses at same location; and (8) bypassed geographically-closer dealers -- i.e., the purchaser for illegal use goes out of his way geographically to buy from certain retailers. If manufacturers made use of these indicators to police their customers, the number of their guns diverted into the secondary market would be reduced.

100.     Sufficient information in the trace database has been made available to defendants (or would have been made available to any defendant that had sought the information) – so that each defendant could have improved its distribution system to reduce the number of guns obtained by criminals.

101.     Firearms manufactured, imported or distributed by defendants that were sold by dealers with a disproportionately large number of traces or other indicators of improper sales

practices are diverted to the illegal market in New York, and used to cause injury or death or the

threat thereof to residents of the City of New York.

**Indications that Defendants Have**
**Knowledge of the Diversion of Handguns to the Illegal Market**

102.     According to Robert Haas, the former Senior Vice President for Marketing and

Sales for defendant Smith & Wesson, the gun industry knows that the criminal market is fueled

by the industry's distribution practices, but does nothing:

> The company and the industry as a whole are fully aware of the
> extent of the criminal misuse of firearms.  The company and the
> industry are also aware that the black market in firearms is not
> simply the result of stolen guns but is due to the seepage of guns
> into the illicit market from multiple thousands of unsupervised
> federal firearms licensees.  In spite of their knowledge, however,
> the industry's position has consistently been to take no
> independent action to insure responsible distribution practices ....

> I am familiar with the distribution and marketing practices of all of
> the principal U.S. firearms manufacturers and wholesale
> distributors and none of them, to my knowledge, … investigate,
> screen or supervise the wholesale distributors and retail outlets that
> sell their products to insure that their products are distributed
> responsibly.

103.     Robert Ricker, an individual with years of experience as a National Rifle

Association and gun industry trade association official, has testified in another lawsuit that the

gun industry is aware of the means by which firearms are diverted from the legal to the illegal

market.  He has testified that the industry knows that gun traces are indicators of problems at the

dealer level and are adequate notice to all up-stream distribution entities of these problems.  He

has testified that dealers often falsely report guns stolen to cover up trafficking.  According to

Mr. Ricker, industry members have not addressed the problems posed by unsupervised dealers

because "if the industry took voluntary action, it would be admitting responsibility," and "the

concept that if you are proactive and take steps to remedy the problem, then you have recognized that you are responsible partially for the problem."

104.    Robert Lockett, a firearms dealer named the 1993 Dealer of the Year by the National Alliance of Stocking Gun Dealers, in an article published in Shooting Sport Retailer, a firearms industry trade magazine, stated, in part:

> I've been told INNUMERABLE times by various manufacturers that they 'have no control' over their channel of distribution. I've been told INNUMERABLE times that once a firearm is sold to a distributor, there is no way a manufacturer can be held responsible for the legal transfer and possession of a firearm. . . .
>
> IF YOU DO NOT KNOW WHERE AND HOW YOUR PRODUCTS ARE ULTIMATELY BEING SOLD - YOU SHOULD HAVE KNOWN OR ANTICIPATED THAT THEY WOULD BE ILLEGALLY SOLD AND SUBSEQUENTLY MISUSED.
>
> Let's just get down and dirty. We manufacture, distribute, and retail items of deadly force . . . Your arguments of yesterday regarding lack of accountability were pretty flimsy. Today, they are tenuous at best. Tomorrow, they are not going to indemnify you. We are going to have to get a whole lot better - and fast - of being in control of our distribution channel.

**<u>Merchandising Practices that Could Reduce Illegal Diversion</u>**

105.    Analysis of trace data collected by the ATF has established that certain merchandising practices by defendants could substantially reduce guns flowing into criminal hands, thereby avoiding many murders and injuries.

106.    There is a statistically significant relationship between the use of certain distribution oversight practices followed by a manufacturer and the manufacturer's ratio of trace share to market share.

107.   Manufacturers that have adopted the following practices have smaller crime gun ratios: (i) requiring evidence of a storefront, (ii) having an authorized dealer program, (iii) maintaining records of sales to individual dealers, (iv) visiting dealers frequently, (v) commissioning market studies, (vi) maintaining distributor agreements, (vii) imposing controls over how the product is advertised, and (viii) inquiring about inventory level of distributors.

108.   Standard marketing mechanisms that could have been employed by defendants using their existing marketing infrastructures to prevent diversion or guns into the secondary market include: (i) requiring dealers and distributors to report the number of trace requests upstream to manufacturers and distributors; (ii) developing a management code establishing standards of conduct on the part of members of the distribution system, including guidelines regarding sales to types of dealers, such as stocking dealers with storefront establishments; (iii) requiring minimum inventory; (iv) imposing liability insurance standards; (v) limiting sales at gun shows; (vi) limiting multiple sales; (vii) limiting how the consumer gun transaction can be conducted to insure security; (viii) education and training of dealers; and (ix) monitoring dealers through visitation and other regular interaction.

109.   If defendants entered into manufacturing and distribution agreements with their distributors and dealers, there would be a significant reduction in the flow of firearms into New York.

110.   If defendants provided training in proper sales and distribution practices to those in the primary firearms market, many firearms would not have and will not in the future find their way into the secondary market in New York.

111.   If defendants had studied available trace request data and acted upon it to better control their downstream customers, they could have used the information to prevent injury or

death or the threat thereof to residents of the City of New York.  The necessary information was and is available to defendants.

112.   Defendants make no meaningful effort to supervise or regulate the practices of either the distributors or dealers who sell defendants' products to the public, despite their knowledge that particular dealers are known to supply large numbers of guns used to commit crimes. Because it is to their advantage, defendants exercise contractual control over their distributors and dealers in such areas as pricing and advertising, but fail to impose on the same distributors and dealers contractual arrangements by which defendants could regulate the sale and disposition of their guns.  Defendants have instead adopted a strategy of willful blindness to the conduct of their distributors and dealers that facilitates the entry of defendants' guns into the illegitimate market.

## FIRST CAUSE OF ACTION:
## <u>PUBLIC NUISANCE</u>

113.   The City realleges paragraphs 1 to 112 as if fully set forth herein.

114.   Defendants, through their, sales, marketing and distribution practices, have knowingly created, supplied, maintained and contributed to an illegitimate market for guns through which criminals, juveniles and other prohibited users obtain guns that are thereafter used in criminal activity in the City of New York.

115.   By acting to create, supply, maintain and contribute to an illegitimate market for guns, defendants have created, contributed to and maintained a public nuisance that unreasonably interferes with rights common to the general public, deprives New York City residents of the peaceful use of public streets, sidewalks and parks, interferes with commerce, travel and the quality of daily life and endangers the property, health and safety of large numbers of residents of New York City.

## SECOND CAUSE OF ACTION:
## <u>STATUTORY NUISANCE</u>

116.    The City realleges paragraphs 1 to 115 as if fully set forth herein.

117.    Defendants, through their sales, marketing and distribution practices, have knowingly created, supplied, maintained and contributed to an illegitimate market for guns through which criminals, juveniles and other prohibited users obtain guns that are thereafter used in criminal activity in the City of New York.

118.    The State of New York declares any unlawfully possessed, transported or disposed of gun to be a nuisance, and further declares the utilization of guns in the commission of an offense to be a "nuisance."  N.Y. Penal Law § 400.05(1).

119.    Defendants' sales, marketing and distribution practices have contributed to the public nuisance that exists by virtue of large numbers of unlawfully used, possessed, transported and disposed-of guns.

**WHEREFORE**, the City respectfully prays that the Court grant judgment against the defendants, and each of them jointly and severally, as follows:

(a)    issue an injunction abating the public nuisance complained of herein by requiring defendants to:

    i)    investigate or screen the distributors and/or dealers through which defendants distribute and sell firearms;

    ii)    monitor, supervise, regulate, and standardize their distributors' and/or dealers' methods of distributing and selling firearms;

    iii)    conduct research, or heed existing research, that would allow them to better monitor and control the flow of firearms to the illegal

market, and then implement the recommended preventive strategies;

iv) establish a more direct distribution system in which defendants remain in control of the distribution of their products;

v) train and encourage their distributors and/or dealers to act lawfully and responsibly to ensure compliance with federal, state, and local laws;

vi) direct and encourage their distributors and/or dealers to refuse to sell firearms under circumstances where the distributor or dealer knows or should know that the firearms will likely not be used for the purchaser's personal use or otherwise will likely not be used for legal purposes;

vii) require their distributors and/or dealers to refuse to sell more than one handgun per month to any person not holding a federal firearms license, and to track sales to enforce this restriction;

viii) require their distributors to sell only to "stocking dealers," *i.e.*, retailers who stock guns for sale from retail stores, and refrain from selling guns over the Internet, at gun shows, or to "kitchen table" dealers;

ix) require their distributors and/or dealers to certify their compliance with all firearms laws and regulations, and to provide documentation of their sales employees' and agents' eligibility to sell guns;

x)     require their distributors and/or dealers to carry a specified minimum amount of liability insurance coverage at all times;

xi)     refrain, and require their distributors and/or dealers to refrain, from using any incentive sales practices that reward a salesperson or a purchaser based on sales or purchase volume;

xii)     require their distributors and/or dealers to meet reasonable, specified security requirements to prevent theft of firearms;

xiii)     require their distributors and/or dealers to maintain computerized inventory tracking programs containing detailed information about the acquisition and disposition of every gun, and subject their distributors and dealers to audits of their inventory and to sanctions for any firearms for which the distributor or dealer cannot account;

xiv)     require their distributors and/or dealers to maintain records of trace requests initiated by law enforcement agencies, and to report those trace requests to the manufacturer of each firearm traced;

xv)     maintain records of trace requests that they receive from law enforcement, and track and analyze where and when in the commercial distribution chain the gun may have been diverted to crime, and take preventive measures to reduce such diversions; and

xvi)     institute effective training, monitoring, and sanctions practices to enforce these requirements, including terminating or otherwise effectively disciplining distributors and/or dealers whom they

know or should know distribute firearms into the unlawful market

or in an illegal or unsafe manner.

b.     award reasonable counsel fees and costs; and

c.     award such other and further relief as the Court may deem appropriate.

Dated:     New York, New York
January 27, 2004

MICHAEL A. CARDOZO
Corporation Counsel of the
  City of New York
Attorney for Plaintiffs
100 Church Street, Room 3-158
New York, New York 10007
(212) 788-1324

By:     _____
Eric Proshansky (EP1777)
Assistant Corporation Counsel

Of Counsel:     Gail Rubin
Richard J. Costa

Center to Prevent Handgun Violence
Legal Action Project
1250 I Street, N.W.
    Suite 802
Washington, D.C. 20005
Dennis A. Henigan
Jonathan E. Lowy
Elizabeth S. Haile