UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x

THE CITY OF NEW YORK,

                    Plaintiff,

     -against-

BERETTA U.S.A. CORP. , et al.,

                  Defendants.

------------------------------------------------------------x

Memorandum and Order
Motion to Dismiss
On Ground of
Prohibitory Statute

00 CV 3641

APPEARANCES:

For Plaintiff City of New York:

       Corporation Counsel of the City of New York
       100 Church St., Room 3-158
       New York, NY 10007
       By: Melanie Ash
           Richard J. Costa
           Eric Proshansky
           Gail P. Rubin

       Brady Center to Prevent Gun Violence
       Legal Action Project
       1225 Eye St NW
       Suite 1100
       Washington, DC 20016
       By: Jonathan E. Lowy
           Elizabeth Schickedanz Haile
           Brian J. Siebel
           Dennis A. Henigan

       Center for Constitutional Litigation
       1050 31st Street N.W.
       Washington D.C., 20007
       By: Robert S. Peck

Thelen Reid & Priest, LLP
875 Third Avenue
New York, NY 10022
By: Michel S. Elkin
    Gabriel Mark Nugent

For Defendant Beretta U.S.A. Corp.:

Gordon, Feinblatt, Rothman, Hoffberger & Hollander, LLC
233 E. Redwood St.
Baltimore, MD 21202
By: Lawrence S. Greenwald

For Defendant Browning Arms Co.:

Friday, Eldredge & Clark, LLP
2000 Regions Center
400 W. Capitol Ave.
Little Rock, AK 72201
By: Jonann E. Chiles
    Jamie Huffman Jones

Renzulli, Pisciotti & Renzulli, LLP
300 E. 42nd Street, 17
New York, NY 10017
By: John F. Renzulli
    Leonard S. Rosenbaum
    Scott Charles Allan

For Defendant Colt's Manufacturing Co., Inc.:

Jones Day
2727 North Harwood St.
Dallas, TX 75201
By: Thomas E. Fennell
    Mark R. Hall
    Joseph Anthony Strazzeri
    Kelly J. Hunt
    Patrick Carew
    Paula Reichenstein
    Michael L. Rice
    Patrick G. Broderick

Pino & Associates, LLP
50 Main Street
Seventh Floor
White Plains, NY 10606
By: Thomas E. Healy

For Defendants Forjas Taurus, S.A. and Taurus International Manufacturing, Inc.:

Budd Larner, P.C.
The Chandler Building
127 Peachtree St., N.E.
Suite 636
Atlanta, GA 30303
By: Bridgette E. Eckerson
    Budd Larner
    Prescott L. Nottingham
    Timothy A. Bumann
    Jennifer C. Kane
    Kathleen C. Marchetti
    J. Clayton Cheshire

For Defendant Glock, Inc.:

Renzulli, Pisciotti & Renzulli, LLP
300 East 42nd St.
New York, NY 10017-5947
By: Christopher Renzulli
    John F. Renzulli
    Scott C. Allan

For Defendant Phoenix Arms:

Tarics & Carrington, PC
5005 Riverway Drive, Suite 500
Houston, TX 77056
By: Michael J. Zomcik

For Defendant Sigarms, Inc.:

Wilson, Elser, Moskowitz, Edelman & Dicker
150 East 42nd Street
New York, NY 10017
By: Robert Laurent Joyce

For Defendant Smith & Wesson Corp.:

Greenberg Traurig, LLP
885 Third Avenue, 24th Floor
New York, NY 10022
By: Alan Mansfield

Pietragallo, Bosick & Gordon
One Oxford Centre
38th Floor
Pittsburgh, PA 15219
By: Clem C. Trischler
    Robert R. Leight

Shook Hardy & Bacon, LLP
2555 Grand Blvd.
Kansas City, MO 64108
By: Stacey Elaine Deere
    Jeffrey Scott Nelson
    Tina Marie Schaefer

For Defendant Sturm, Ruger & Co., Inc.:

Wildman, Harrold, Allen & Dixon, LLP
225 W. Wacker Dr.
Chicago, IL 60606
By: James P. Dorr
    Sarah Liddell Olson

Gallagher Gosseen Faller Kaplan & Crowle
1010 Franklin Avenue
Suite 400
Garden City, NY 11530
By: William Edward Vita

For Defendants AcuSport Corp.; Alamo Leather Goods, Inc.; Bangers, L.P.; Bill Hicks & Co.;
Brazas Sporting Arms, Inc.; Camfour Inc.; Chattanooga Shooting Supplies, Inc.; Davidson's
Supply Co., Inc.; Dixie Shooters Supply, Inc.; Ellet Brothers, Inc.; Euclid Ave. Sales Co.; Faber
Brothers, Inc.; Glen Zanders Fur and Sporting Goods Co.; Hicks, Inc.; Kiesler Police Supply,
Inc.; Lew Horton Distributing Co.; Lipsey's Inc.; MKS Supply Co.; Riley's, Inc.; RSR Group,
Inc.; Ron Shirk's Shooter's Supplies, Inc.; Southern Ohio Gun, Inc.; Sports South, Inc.; Valor
Corp.; Walter Craig, Inc.; Williams Shooter's Supplies:

The Chiafullo White Group, LLP
12 New Providence Road, Suite 201
Watchung, NJ 07069
By: Christopher M. Chiafullo

For Bureau of Alcohol, Tobacco, Firearms and Explosives:

Bureau of Alcohol, Tobacco, Firearms and Explosives
Office of Chief Counsel
650 Massachusetts Avenue, N.W., Room 6100
Washington D.C. 20226
By: Barry Orlow, Esq.

For United States:

United States Attorney's Office
Eastern District of New York
1 Pierrepont Plaza, 14th floor
Brooklyn, NY 11201
By: Elliot M. Schachner

JACK B. WEINSTEIN, Senior District Judge:

## TABLE OF CONTENTS

I. Introduction ........................................................................................................... 8

II. Complaint ............................................................................................................. 9

III. Applicability of Act .............................................................................................. 22
    A. Arguments of the Parties ................................................................................ 22
        1. Defendants' Contention that the Act Bars the Instant Litigation ................... 22
        2. Plaintiff's Contention that the Instant Litigation is Allowed
           Under an Exception to the Act ................................................................. 23
    B. Applicability of Exception to the Instant Litigation .................................................. 25
        1. The Act ........................................................................................... 25
        2. New York Penal Law Section 240.45 ........................................................ 28
        3. Requirement of a Federal or State Law "Applicable to" the Sale
           or Marketing of Firearms ....................................................................... 29
                a. Statutory Interpretation ............................................................. 29
                b. Power of Courts to Interpret Laws .............................................. 34
                c. Legislative History ................................................................... 39
        4. Requirement of an Action "in Which" a Manufacturer or Seller
           Violated a State or Federal Statute ........................................................... 42
                a. Time When Exception is to be Applied .................................... 42
                b. Lack of Need for Prior Decision that Penal Law
                    240.45 was Violated ..................................................... 43
                c. Adequacy of the Complaint to Raise Exception Issue ............. 46
    C. Conclusion as to Application ........................................................................... 48

IV. Constitutionality of Act ......................................................................................... 48
    A. Introduction ................................................................................................ 48
    B. Regional Conflicts ....................................................................................... 49
        1. History ........................................................................................... 49
        2. The Present Conflict ........................................................................... 52
        3. Respect for Balancing by Congress ......................................................... 56
    C. Commerce Clause ........................................................................................ 65
        1. Dormant Commerce Clause ................................................................... 65
        2. Legislative History of Act ...................................................................... 66
        3. Recent Commerce Clause Cases .............................................................. 70
    D. General Congressional Powers ....................................................................... 78
        1. Preemption ...................................................................................... 78
        2. Deprivation of Existing Rights; Ex Post Facto ............................................. 80
        3. Retroactivity .................................................................................... 81
        4. Effect on Pending Cases ....................................................................... 83
    E. First Amendment ......................................................................................... 88

    F. Second Amendment ............................................................................................ 88
    G. Tenth and Eleventh Amendments ..................................................................... 89
    H. Fourteenth and Fifth Amendments .................................................................... 90
        1. Due Process and Equal Protection ............................................................. 90
        2. Section 5 ....................................................................................................... 91
    I. Conclusion as to Constitutionality ...................................................................... 95

V. Stays ......................................................................................................................... 95

VI. Conclusion; Certification of Interlocutory Appeal; Stay ...................................... 97

APPENDIX - Protection of Lawful Commerce in Arms Act ....................................... 98

## I. Introduction

The City of New York ("City') sues the main suppliers of handguns in the United States ("Gun Industry") seeking injunctive relief and abatement of an alleged public nuisance caused by the Gun Industry's negligent and reckless merchandising. Standing to bring the action is based upon the City's police powers, its public health responsibilities (handguns are the cause of death to a majority of persons in one age-ethnic group) and New York State substantive law and equity. The likelihood of continuing harm to the City and its residents from negligent merchandising of handguns outside the state supports standing. *See, e.g.*, Daniel A. Farber, *Uncertainty as a Basis for Standing*, 33 Hofstra L. Rev. 1123 (2005).

After extensive discovery and pretrial motion practice, trial was scheduled to begin on November 28, 2005. *See* Docket Entries to 1021. Prior decisions had demonstrated a factual basis for the City's suit. *See N.A.A.C.P. v. Acusport*, 271 S. Supp. 2d 435 (E.D.N.Y. 2003) (findings of fact and law); *City of New York v. Beretta*, 315 F. Supp. 2d 256 (E.D.N.Y. 2004) (denying motion to dismiss).

On October 26, 2005, the President of the United States approved the Protection of Lawful Commerce in Arms Act, Pub. L. No. 109-92, 109 Stat. 2005 ("PLCAA" or "Act"). The Act, which was immediately effective, requires that a "qualified civil liability action that is pending on the date of enactment ... shall be immediately dismissed." PLCAA § 3(b) (attached as the appendix to this memorandum). The stated purpose is to promptly terminate existing and prevent future "qualified civil liability actions," as defined by the Act.

On the afternoon of October 26, 2005, hours after the Act was signed into law, Defendants moved for a permanent stay and for dismissal. *See* Defs.' Mot. to Dismiss ("Defs.'

Mot.") 1 (Docket No. 997). They contend that the Act is constitutional. *See* Defs.' Reply Mem. in Supp. of Mot. to Dismiss ("Defs.' Reply") 14-48 (Docket No. 1032).

Dismissal is opposed by the City on the grounds that (1) the Act is inapplicable because the case falls within an exception to a "qualified civil liability action," and (2), if the Act is applicable to the present litigation, it is unconstitutional. *See* Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss ("Pl.'s Second Mem. in Opp.") 1-3 (Docket No. 1027-1).

The United States has intervened for the limited purpose of defending the constitutionality of the Act. It takes no position on applicability. *See* Br. of the United States Concerning Constitutionality of the Protection of Lawful Commerce in Arms Act ("U.S. Br.") 1; Tr. of Arguments of November 21, 2005 57-58.

The November 28, 2005 trial date has been vacated and a temporary stay entered by this court. *See* Order dated November 7, 2005 (Docket No. 1023). A full hearing was conducted on November 21, 2005. *See* Tr. of Arguments of November 21, 2005. Decision was reserved.

For the reasons described below, defendants' motion to dismiss is denied. The Act is inapplicable to the present litigation. Were it applicable, it would be constitutional. The temporary stay of all proceedings is continued to permit an interlocutory appeal.

## II. Complaint

The basis of the Second Amended Complaint ("complaint") is summarized in the complaint by a "Preliminary Statement" as follows:

> 1. This is a civil action seeking injunctive relief and abatement of the public nuisance that defendants cause, contribute to and maintain by their marketing and distribution practices.

9

2. A public nuisance exists in New York in the form of widespread access to illegal firearms, causing harm to the population at large by endangering and injuring the lives, property, health, safety or comfort of a considerable number of persons.

3. All of the defendants manufacture and/or distribute firearms that were possessed or used illegally in New York City.

4. Because virtually every gun used in a crime starts off as a legal firearm, it is evident that guns manufactured by defendant gun manufacturers and distributed by defendant gun distributors are diverted into an illegal gun market catering to juveniles, criminals and other persons prohibited from owning guns.

5. That diversion is a result of defendants' failure to institute appropriate marketing and distribution practices.

6. Defendants have reason to know or should know that (a) some of the firearms they manufacture and/or distribute will be diverted into the hands of those who would violate the law, and (b) they could take steps to reduce the number of firearms that fall into the hands of criminals by changing their merchandising practices.

7. Reasonable measures are available to ensure that the guns sold and distributed by defendants do not find their way into a secondary illegal market.

8. Defendants could, but do not, monitor, supervise or regulate the sale and distribution of their guns by their downstream distributors or deal-customers. Defendants could, but do not, monitor, supervise or train distributors or dealers to avoid sales that feed the illegal secondary market. Defendants make no effort to determine those distributors and dealers whose sales

disproportionately supply the illegal secondary market.

9. Residents of the City of New York are exposed to death and injury from firearms. The extent of that exposure would be reduced in New York if defendants followed more prudent merchandising policies.

10. Defendants' sales and distribution practices accordingly cause, contribute to and maintain a public nuisance consisting of a large and ready supply of guns purchased by criminals and used in the commission of crimes.

11. The City seeks injunctive relief requiring defendants to adopt reasonable measures that will reduce the movement of their products into the illegal secondary market, thereby abating the public nuisance.

Compl. ¶¶ 1-11 (Docket No. 147).

"Facts" supporting the case were alleged as follows:

### Firearms Violence in the United States and the State and City of New York

56. The United States leads the world in the number of people and in the number of children who die and are injured each year by guns. The yearly toll of several thousand persons killed compares to no more than a few hundred per year in every other industrialized country. A teenager in the United States is more likely to die from a gunshot wound than from all natural causes combined.

57. New York City strictly limits the people who may possess guns within the City. In accord with the long-standing recognition that the number of deaths and injuries in a particular locality is

related to the availability of guns, New York City has enacted comprehensive gun laws intended to keep guns out of the hands of juveniles and criminals. The City's laws, among other things, prohibit the possession of firearms without a license; prohibit possession by certain persons, including those previously convicted of a felony, those with mental disorders, and anyone under the age of 21; prohibit the selling of firearms without safety locking devices and written warnings regarding safe firearm storage; require that licensees not purchase handguns without prior written authorization from the New York City Police Department; require written request of the Police Department to purchase more than one gun and require notice to the Police Department when an owner sells his gun. 38 RCNY § 3-01 to 38 RCNY § 6-33.

58. Despite the City's efforts, persons legally prohibited from owning firearms and those without the requisite New York or New York City license are able to obtain, possess and use illegal firearms in New York City. Firearms are by far the preferred method of murder in New York City, and are used in approximately 60% of the murders committed each year. In 1996, 652 people were murdered with a firearm in New York City; in 1997, 465 were murdered with guns; in 1998, 375; and in 1999, 391. Approximately double the number of persons are injured by the criminal use of firearms with over 2,000 criminal shooting victims reported each year in New York City.

59. Firearms are also used in connection with many crimes other than murder. 1998, for example, of the 39,358 reported robberies in the City, 7,640 or approximately 20% involved the use of firearm. In that same year, of the 2,181 reported felony reckless endangerment cases, 23% involved the use of a firearm and 20%

12

of menacing cases also involved the use of a firearm. These figures are typical of more recent years.

60.   In the period from August 1, 1997 through July 31, 1998, the United States Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), through its National Firearms Tracing Database (the "Trace Database"), traced 8,437 guns used in crimes in New York City. The 8,437 crime guns traced were used in the commission of 433 robberies, 309 assaults/threats, 278 homicides, 143 Narcotics crimes, 101 burglaries/thefts/frauds, and 7,123 firearms-related offenses.

61.   Of the 8,437 guns traced, 618 were used in crimes committed by juveniles age 17 and under.

62.   Defendants manufactured or distributed a large number of guns recovered in crimes committed in New York City and New York State. According to ATF trace data for the last five years, thousands of guns manufactured or distributed by defendants were used to commit crimes in the City of New York. This number includes only guns that were recovered in the course of a crime. The actual number of defendants' "crime guns" used in New York City over the last five years is vastly higher.

### The Primary and Secondary Market for Guns

63.   The firearms market consists of a primary and a secondary market.

64.   The primary market consists of transactions through which new firearms move from manufacturers or importers through distributors and retailers to a first retail purchaser.

65.   Although there is a legitimate secondary market for

13

firearms, that market also includes an illegal segment made up of private transactions among non-federally licensed individuals.

66.    The illegal, secondary market is a significant source of firearms to criminals. Most firearms are acquired by criminals through transactions in the secondary market.

67.    Criminals are an important market segment for the gun industry. Recent analyses have shown that 11% of handguns sold between 12996 and 2000 were used in violent crimes by the year 2000; 18% of handguns sold in the year 1990 were in the hands of violent criminals or used in violent crimes by the year 2000.

68.    Recent analyses have shown that guns move quickly from the legal to the illegal market; 13% of guns recovered in crimes were recovered within one year of their sale, and 30% were recovered within 3 years of their first sale. ATF trace data indicates that as many as 43% of guns used in crimes in urban centers across the United States were purchased from retail dealers less than three years prior to commission of the crime. A relatively short interval between the retail sale of a gun and its recovery in a crime is an accepted indicator that a party to the initial retail transaction intended to transfer the gun to a prohibited used or into the illegal market.

69.    The firearm trafficking investigations of the New York Police Department-ATF Joint Task Force also indicate that most of the guns purchased in the secondary market were relatively new. Many times the task force members brought brand new guns, many of them still in original boxes with manuals and gun cleaning paraphernalia. The guns seized and investigated almost invariably did not come from retail sources in the City of New

York, but came from out-of-state. Few of the guns recovered had been diverted into the illegal market through theft. Firearms can be obtained easily in New York City in the secondary market despite prices that are often two to three times the price charged by legitimate dealers.

## Diversion to the Illegal Market

70. Diversion of guns from the primary, legal market to the illegal, secondary market is caused in large part through defendants' marketing practices.

71. Defendants are aware that many guns that they sell, directly or indirectly, to retail dealers find their way into the secondary market through specific sales practices by gun dealers.

72. Defendants have failed to prevent diversion to the illegal market by, *inter alia*, failing to: monitor corrupt dealers; require retail sales only through storefront establishments; limit sales made a gun shows; prohibit straw purchases by dealers; limit multiple sales; and limit sales to dealers in states with lax gun laws.

## Illegal Sales at Gun Shows

73. Gun shows are a significant source of guns that fall into the hands of criminals. Sales at gun shows by non-licensed persons to private citizens fall outside the three-tier process of the sales of a new firearm from a manufacturer through a distributor and dealer to a first retail purchaser. This constitutes a loophole for guns to be supplied to criminals, and defendants are aware of this loophole.

74. Although a Federal Firearms Licensee ("FFL") selling at a

gun show must comply with the same regulations that apply for a sale at a business establishment, FFLs circumvent that rule in practice. Defendants are aware that FFL's selling at gun shows circumvent that rule.

75.    Firearms manufactured, imported or distributed by defendants that have been acquired at gun shows are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City of New York.

### Private Sellers and Other Non-Storefront Sales

76.    The law does not require private sellers of firearms—so-called "non-stocking" or "kitchen-table" dealers who are not "engaged in the business" of selling firearms and who do not operate from a storefront—to conduct backgrounds checks or to maintain records that an FFL is required to maintain. This constitutes a loophole for diversion of guns to criminal elements, and defendants are aware of this loophole.

77.    Defendants could sharply limit or eliminate sales by non-stocking, or kitchen-table dealers through the use of prudent merchandising practices at little cost or loss of business.

78.    Firearms that defendants have sold through non-stocking or kitchen-table dealers are diverted to the illegal market in New York and used to cause injury, death or the threat thereof to residents of the City of New York.

### Straw Purchases

79.    Straw purchases, wherein the purchaser buys the gun from a licensed dealer for a person who is not qualified to purchase the firearm under federal and state regulations, are a source of firearms

for the secondary market. In one recent law enforcement study, more than 50% of the firearms subject to firearm trafficking investigations had been acquired as part of a straw purchase. The circumstances of many of these purchases indicated or should have indicated to the firearms sellers that they were "straw purchases."

80.    A seller who knowingly makes a sale to someone who is a straw purchaser conducts an illegal transaction and therefore commits as felony. Defendants are aware that this law does not deter a substantial number of sellers from engaging in straw purchases.

81.    Defendants could sharply limit straw sales by regulating their own customers through the use of prudent merchandising practices. This result could be achieved at little cost or loss of business.

82.    A substantial number of firearms manufactured , imported or distributed by defendants were acquired by a straw purchase, diverted to the secondary market in New York City, and used to cause injury, death or the threat thereof to residents of the City of New York.

<u>Multiple Sales</u>

83.    Guns are diverted to the illegal gun market after being sold as part of a "multiple sale," in which the purchaser buys more than one gun at the same time or over a limited time period from a licensed dealer with the intention of later transferring the guns to persons unqualified to purchase under federal and state gun laws. Large multiple sales to one person by a single FFL are a further source of firearms for the secondary market.

84.     Firearms manufactured, imported or distributed by
defendants are acquired as part of a multiple purchase, diverted to
the illegal market in New York, and used to cause injury, death or
the threat thereof to residents of the City of New York.

Corrupt FFLs

85.     Guns acquired by criminals can be obtained through
intentional trafficking by an FFL. Defendants are aware that some
FFLs are corrupt and that they should not do business with such
dealers, but defendants nevertheless continue selling to such
dealers until ATF revokes the dealers' licenses, which often takes
years.

86.     Guns are diverted to the illegitimate gun market through
corrupt dealers. According to a recent ATF study, just 1.2% of
dealers accounted for over 57% of the crime guns traced to current
dealers in 1998. For example, in 1998, just over 450 licensed
dealers had ten or more crime guns with a time-to-crime of three
years or less traced to them. In addition, a congressional study of
ATF data found that an extraordinary proportion of crime guns
were purchased from the same "high crime" gun dealers. The
same 137 dealers were the source of more than 34,000 crime guns
between 1996 and 1998.

Other Means of Diversion

87.     Guns manufactured, imported or distributed by defendants
are stolen from FFLs with poor security arrangements, and FFLs
falsely report thefts to conceal trafficking. These guns are diverted
to the secondary market in New York, and used to cause injury,
death or the threat thereof to the residents of the City of New York.

88.   Some manufacturer or distributor defendants sell guns in
states where gun regulations are lax. These manufacturers and
distributors know or should know that the guns would be taken
into New York City to be used illegally. Defendants produce,
market and distribute substantially more handguns than they
reasonably expect to sell to law-abiding purchasers. They
oversupply states with weak handgun controls and restrictions,
such as certain southern states along the I-95 corridor, with
substantially more handguns than they know or should know will
be purchased by legitimate purchasers in those states. Defendants
do so with the knowledge that the oversupply will be sold to
prohibited purchasers in states, countries and cities, like New York
City, which have strong restrictions on the purchase and ownership
of firearms. Guns are diverted to the illegal market through sales
in states with weak gun control laws to persons who transport the
guns to places with strict gun control laws, such as New York City,
a fact confirmed by recent ATF data indicating that over 84% of
the crime guns recovered in New York City come from out of
state. Of these crime guns, the top source states were Virginia
(414), Florida (329), Georgia (282), North Carolina (268), South
Caroline (224), Pennsylvania (159), Ohio (136), Alabama (106)
and Texas (99).

89.   Handguns manufactured, imported or distributed by
defendants are acquired in states and cities where gun regulations
are lax, diverted to the illegal market in New York, and use to
cause injury, death or the threat thereof to residents of the City of
New York.

Compl. ¶¶ 56-89.

The complaint alleges that the defendants know about the diversions of handguns to the

illegal market, and have the power to minimize this diversion by relatively simple and inexpensive modifications in their merchandising practice, but refuse to make these changes. Compl. ¶¶ 102-112.

A judgment is sought against each defendant jointly and severally that the court:

(a)  Issue an injunction abating the public nuisance complained of herein by requiring defendants to:

i) investigate or screen the distributors and/or dealers through which defendants distribute and sell firearms;

ii) monitor, supervise, regulate, and standardize their distributors' and/or dealers' methods of distributing and selling firearms;

iii) conduct research, or heed existing research, that would allow them to better monitor and control the flow of firearms to the illegal market, and then implement the recommended preventive strategies;

iv) establish a more direct distribution system in which defendants remain in control of the distribution of their products;

v) train and encourage their distributors and/or dealers to act lawfully and responsibly to ensure compliance with federal, state, and local laws;

vi) direct and encourage their distributors and/or dealers to refuse to sell firearms under circumstances where the distributor or dealer knows that the firearms will likely not be used for the purchaser's personal use or otherwise will likely not be used for legal purposes;

vii) require their distributors and/or dealers to refuse to sell more than one handgun per month to any person not holding a federal firearms license, and to track sales to enforce this restriction;

viii) require their distributors to sell only to "stocking dealers," *i.e.*, retailers who stock guns for sale from retail stores, and refrain from selling guns over the Internet, at gun shows, or to "kitchen-table" dealers;

ix) require their distributors and/or dealers to certify their compliance with all firearms laws and regulations, and to provide documentation of their sales employees' and agents' eligibility to sell guns;

x) require their distributors and/or dealers to carry a specified minimum amount of liability insurance coverage at all times;

xi) refrain, and require their distributors and/or dealers to refrain, from using any incentive sales practices that reward a salesperson or a purchaser based on sales purchase volume;

xii) require their distributors and/or dealers to meet reasonable, specified security requirements to prevent theft of firearms;

xiii) require their distributors and/or dealers to maintain computerized inventory tracking programs containing detailed information about the acquisition and disposition of every gun, and subject their distributors and dealers to audits of their inventory and to sanctions or any firearms for which the distributor or dealer cannot account;

xiv) require their distributors and/or dealers to maintain records of trace requests initiated by law enforcement agencies, and to report those trace requests to the manufacturer of each firearm traced;

xv) maintain records of trace requests that they receive from law enforcement, and track and analyze where and when in the commercial distribution chain the gun may have been diverted

to crime, and take preventive measures to reduce such diversions; and

> xvi) institute effective training, monitoring, and sanctions practices to enforce these requirements, including terminating or otherwise effectively disciplining distributors and/or dealers whom they know or should know distribute firearms into the unlawful market or in an illegal or unsafe manner.

Compl. 26-29.

Reasonable counsel fees and costs are sought. Compl. 29.

The complaint is adequate. *See City of New York v. Beretta,* 315 F. Supp. 2d 256 (E.D.N.Y. 2004) (denying motion to dismiss). Detailed statutes or cases relied upon by a plaintiff need not be cited. *See* Fed. R. Civ. P. 8(a); *Brock v. Superior Care, Inc.* 840 F.2d 1054, 1063-64 (2d Cir. 1988) (there is no requirement for statutory citation in complaint).

## II. Applicability of Act

### A.     Arguments of the Parties

#### 1.     Defendants' Contention that the Act Bars the Instant Litigation

Defendants' motion to dismiss is grounded on the theory that the Act requires immediate dismissal. *See* Defs.' Mem. in Support of Mot. to Dismiss ("Defs.' Mem.") 1 (Docket No. 998). They point out that the Act prohibits the institution of a "qualified civil liability action" in any state or federal court and provides that any such "action that is pending on the date of enactment of this Act shall be immediately dismissed by the court in which the action was brought or is currently pending." PLCAA § 3(a) & (b).

With exceptions, a "qualified civil liability action" is a "civil action ... brought by any

22

person against a manufacturer or seller of a [firearm that has been shipped or transported in interstate or foreign commerce] ... for damages, ... injunctive or declaratory relief, abatement, ... or other relief, resulting from the criminal or unlawful misuse of [the firearm]." *Id.* §§ 4(4) and 4(5). This litigation, defendants argue, falls squarely within the plain language of a "qualified civil liability action." The City is a "person" as defined by the Act. *Id.* § 4(3) ("'person' means any ... corporation, ... or any other entity, including any governmental entity"). Defendants are manufacturers and sellers of firearms that have been shipped or transported in interstate or foreign commerce, and are protected by the Act. *Id.* §§ 4(2) (defining "manufacturer"), 4(6) (defining "seller"). Finally, this case—described in the complaint as "a civil action seeking injunctive relief and abatement of [a] public nuisance" that "exists in New York in the form of widespread access to illegal firearms," Compl. ¶¶ 1, 2—is a civil action for relief "resulting from the criminal or unlawful misuse" of firearms shipped or transported in interstate or foreign commerce. *See* PLCAA § 4(9) ("'unlawful misuse' means conduct that violates a statute, ordinance, or regulation as it relates to the use of" a firearm shipped or transported in interstate or foreign commerce). Because this case falls within the definition of a "qualified civil liability action" prohibited by the Act, defendants seek immediate dismissal of the case, with prejudice. *See* Defs.' Mem. 2.

### 2. Plaintiff's Contention that the Instant Litigation is Allowed under an Exception to the Act

The City contends that the present action "rests comfortably" outside of the statutory definition of a qualified civil liability action because it falls under section 4(5)(A)(iii) of the Act. That section preserves from dismissal actions in which a firearms manufacturer or seller

23

knowingly violated a state or federal statute "applicable to" the sale or marketing of firearms and the violation was a proximate cause of the harm for which relief is sought. Pl.'s Mem. in Opp. to Defs.' Mot. to Dismiss ("Pl.'s First Mem. in Opp.") 2 (Docket No. 1014). According to the City, the complaint and the facts adduced in discovery establish, the pleadings allege, and the trial will place at issue defendants' knowing violation of section 240.45 of the New York Penal Law ("New York PL 240.45"). Section 240.45, it is contended by the City, is "applicable to" the sale and marketing of firearms. Furthermore, since conduct violating New York PL 240.45 is precisely the conduct alleged to cause the nuisance, violation of the statute proximately causes the harm for which relief is sought. Pl.'s First Mem. in Opp. 2-3. Because the City's action is one in which a firearms manufacturer or seller allegedly knowingly violated a state statute applicable to the sale or marketing of firearms, which violation proximately caused the harm complained of, the City contends it should not be dismissed. Pl.'s First Mem. in Opp. 3.

Defendants respond that the exceptions in the Act should be construed narrowly and that, as so construed, the City's action does not fall under section 4(5)(A)(iii). Defs.' Reply 10-14. They point out that the general exception created in section 4(5)(A)(iii) for lawsuits based on a knowing violation of a state or federal statute "applicable to" the sale or marketing of firearms is followed by two examples of violations that trigger that exception. *See* PLCAA § 4(5)(A)(iii)(I) (excepting from the definition of a "qualified civil liability action" cases in which a manufacturer or seller "knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to [firearms], or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the . . . disposition of a [firearm]"); PLCAA § 4(5)(A)(iii)(II) (excepting cases in which a manufacturer or seller "aided, abetted, or conspired with any other

24

person to... dispose of a [firearm], knowing or having reasonable cause to believe, that the actual buyer... was prohibited from possessing or receiving a firearm"). According to the defendants, the general exception in section 4(5)(A)(iii) is limited to actions of the type described in these two examples, namely, violations of statutes specifically—and explicitly—regulating the manner in which firearms are sold or marketed. *See* Defs.' Reply 10-14. Because New York PL 240.45 is not, defendants contend, such a statute, the City's action does not fall under section 4(5)(A)(iii), is a qualified civil liability action, and must be dismissed.

For the reasons discussed below, the Act is not applicable to the instant litigation.

## B. Applicability of Exception to the Instant Litigation

### 1. The Act

The Act is primarily a set of definitions supporting two directory provisions, one of which bars commencing a defined type of civil action—a "qualified civil liability action"—in state or federal court, and another that directs state and federal courts to dismiss pending civil actions that meet the definition. *See* PLCCA § 3(a) and (b). The directory provisions of the Act's 3(a) and (b) state:

> (a) IN GENERAL. A qualified civil liability action may not be brought in any Federal or State court.
> (b) DISMISSAL OF PENDING ACTIONS. A qualified civil liability action that is pending on the date of the enactment of this Act shall be immediately dismissed by the court in which the action was brought or is currently pending.

The definition of a "qualified civil liability action" that is a necessary condition for

25

sections 3(a) and (b) to apply is found in Section 4(5):

> (5) QUALIFIED CIVIL LIABILITY ACTION.
>
>> (A) IN GENERAL.  The term "qualified civil liability action" means a civil action or proceeding or an administrative proceeding brought by any person against a manufacturer or seller of a qualified product, or a trade association, for damages, punitive damages, injunctive or declaratory relief, abatement, restitution, fines, or penalties, or other relief, resulting from the criminal or unlawful misuse of a qualified product by the person or a third party. . . .

Sections 4(5)(A)(i), (ii) and (iii) provide that qualified civil liability actions "*shall not include*" actions in which specified conduct is placed at issue.  (Emphasis added.)  Actions that meet the definitions of Section 4(5)(A)(i)(ii) or (iii) are excluded from the scope of the directory provisions.  Such actions are, as indicated below, not "qualified civil liability actions" even if they might otherwise meet the definition of Section 4(5)(A).  The provision reads:

> (5) QUALIFIED CIVIL LIABILITY ACTION.
>
>> (A) ... The term "qualified civil liability action"... shall not include–
>
>>> (i) an action brought against a transferor convicted under section 924(h) of title 19, United States Code, or a comparable or identical State felony law, by a party directly harmed by the conduct of which the transferee is so convicted;
>>>
>>> (ii) an action brought against a seller for negligent entrustment or negligence per se;
>>>
>>> (iii) an action in which a manufacturer or

26

> seller of a qualified product *knowingly violated a*
> *State* or *Federal statute applicable to the sale or*
> *marketing of the product, and the violation was a*
> *proximate cause of the harm for which relief is*
> *sought, ....*

(Emphasis added.)

The general exception in section 4(5)(A)(iii) for lawsuits based on a knowing violation of a state or federal statute "applicable to" the sale or marketing of firearms is followed by two specific examples of statutory violations that trigger that exception. PLCAA §§ 4(5)(A)(iii)(I) and (II) read:

> (iii) an action in which a manufacturer or seller of a qualified product knowingly violated a State or Federal statute applicable to the sale or marketing of the product, and the violation was a proximate cause of the harm for which relief is sought, including–

>> (I) any case in which a manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to the qualified product, or aided, abetted, or conspired with any person in making any false or fictitious oral or written statement with respect to any fact material to the lawfulness of the sale or other disposition of a qualified product; or

>> (II) any case in which the manufacturer or seller aided, abetted, or conspired with any other person to sell or otherwise dispose of a qualified product, knowing, or having reasonable cause to believe, that the actual buyer of the qualified product was prohibited from possessing or

27

receiving a firearm or ammunition under subsection (g) or

(n) of section 922 of title 18, United States Code.

For ease of reference, section 4(5)(A)(iii) is referred to as the "predicate exception,"

because its operation requires an underlying or predicate statutory violation. The "State or

Federal statute applicable to the sale or marketing of the product," whose violation serves as the

basis for invoking the predicate exception is referred to as a "predicate statute."

## 2.    New York Penal Law Section 240.45.

According to the City, the allegations of its complaint and the facts adduced in discovery

fall within the predicate exception by establishing a *prima facie* violation of New York PL

240.45, Criminal Nuisance in the Second Degree. Proof of the allegations in the City's

complaint, the City contends, will establish that the defendants have committed a knowing

violation of New York PL 240.45, and that the violation was a proximate cause of the public

nuisance at issue in the City action, so that this action is not a "qualified civil liability action,"

and not subject to dismissal. *See* Pl.'s First Mem. in Opp. 5-6.

New York PL 240.45 provides:

A person is guilty of criminal nuisance in the second
degree when:

By conduct either unlawful in itself or unreasonable under
all the circumstances, he knowingly or recklessly creates or
maintains a condition which endangers the safety or health of a
considerable number of persons; ....

28

### 3. Requirement of a Federal or State Law "Applicable to" the Sale or Marketing of Firearms

#### a. Statutory Interpretation

"Our starting point in statutory interpretation is the statute's plain meaning, if it has one." *United States v. Dauray*, 215 F.3d 257, 260 (2d Cir. 2000). In *Dauray*, the Court of Appeals for the Second Circuit determined that where Congress had not defined the terms at issue, the court would "consider the ordinary, common sense meaning of the words." *Id. See also Smith v. United States,* 508 U.S. 223, 228 (1993) ("When a word is not defined by statute, we normally construe it in accord with its ordinary or natural meaning."); *INS v. Cardoza-Fonesca*, 480 U.S. 421, 431-32 (1987) (legislative purpose "is expressed by the ordinary meaning of the words used."); *Escondido Mut. Water Co., v. LaJolla Band of Mission Indians,* 466 U.S. 765, 772 (1984) ("[I]t should be generally assumed that Congress expresses its purposes through the ordinary meaning of the words it uses."). "The preeminent canon of statutory interpretation requires us to 'presume that [the] legislature says in a statute what it means and means in a statute what it says there.'" *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (citing *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253-54 (1992)).

By its plain meaning, New York PL 240.45 satisfies the language of the predicate exception requiring a "statute applicable to the sale or marketing of [firearms]." As courts have repeatedly held, the term "applicable" means "capable of being applied." *Snyder v. Buck*, 75 F. Supp. 902, 907 (D.D.C. 1948). *See also, e.g., Whalin v. Sears Roebuck & Co.*, No. 94 C 1518, 1995 U.S. Dist. LEXIS 1838, at *8-9 (N.D. Ill. Feb. 13, 1995) ("The common definition of the word applicable is 'capable of or suitable for being applied.'"); *Interwest Constr. v. Palmer,* 923 P.2d 1350 (Utah 1996) ("'applicable' is defined as 'fit, suitable, pertinent, related to, or

appropriate; capable of being applied'"); *Whitney v. American Fidelity Co.,* 215 N.E.2d 767, 768 (Mass. 1966) ("Dictionary definitions of the word 'applicable' include the words 'fit,' 'suitable,' 'pertinent,' 'appropriate,' or 'capable of being applied.'").

This judicial understanding is buttressed by the ordinary usage described in dictionary definitions. "[T]he Standard Dictionary defines the word 'applicable' as follows: 'Applicable, capable of being applied; suitable or fit for application; relevant, fitting.' Webster's Dictionary contains the following definition: 'Capable of being applied; fit; suitable; pertinent.' Black's Law Dictionary, 3d Ed. . . defines the term as follows: 'Applicable, fit, suitable, pertinent, or appropriate.'" *Snyder,* 75 F. Supp. at 907. The Oxford American Dictionary defines "applicable" as "that [which] may be applied." Oxford American Dictionary and Language Guide 42 (1999). *See also Whalin,* 1995 U.S. Dist. LEXIS 1838, at *8-9 (citing Webster's Ninth New Collegiate Dictionary for the definition "capable of or suitable for being applied"); *Interwest Constr.,* 923 P.2d at 1359 (citing Black's Law Dictionary, 6th Ed., for the definition "fit, suitable, pertinent, related to, or appropriate; capable of being applied").

Defendants cite the definition of "apply" given in the current edition of Black's Law Dictionary, which is "[t]o employ for a limited purpose; [t]o put to use with a particular subject matter." Black's Law Dictionary 109 (8th ed. 2004). Despite defendants' assertion to the contrary, this definition is neither "narrower" than the usual definitions cited above nor "contrary to" those definitions. Defs.' Reply 11. In fact, Webster's Dictionary, relied upon for the definition of "applicable," contains a definition of "apply" similar to that in the current edition of Black's Law Dictionary. *See* Webster's Third New International Dictionary 105 (1993) (defining "apply" as "to use for a particular purpose or in a particular case"). This contrast makes grammatical sense. In any individual instance, a court would in fact "apply" a statute to a

particular (and therefore limited) purpose. At the same time, however, that statute might be "applicable" to a host of other purposes. A statute's applicability describes the complete range of limited purposes to which it is "capable" of being put and the multitude of subject matters with regard to which it may be used. *See* Black's Law Dictionary 91 (5th ed. 1979) ("The word 'apply' is used in connection with statutes in two senses. When construing a statute, in describing the class of persons, things, or functions which are within its scope. . . When discussing the use made of a statute, referring to the process by which the statute is made operative; as where a jury is told to 'apply' the statute of limitation if they find that the cause of action arose before a given date.").

While New York PL 240.45 has not yet been applied to the sale or marketing of firearms, the common law doctrine of public nuisance from which it was derived has been so applied. This court has already held that the City's allegations that the sales and marketing practices of gun manufacturers and distributors have "endanger[ed] ... the property, health, safety or comfort of a considerable number of persons" stated a cause of action for public nuisance. *See City of New York v. Beretta,* 315 F.Supp. 2d 256, 277, 283-84 (E.D.N.Y. 2004). Likewise, in *NAACP v. Acusport, Inc.,* the court concluded that the evidence presented at trial established that the defendant manufacturers and sellers of firearms were responsible for the creation of a public nuisance. *See NAACP v. Acusport,* 271 F. Supp 2d 435 (E.D.N.Y. 2003) (dismissing the plaintiff's suit despite the public nuisance created by defendants' actions because the plaintiff had failed to establish standing to press the public nuisance claim). *But see People v. Sturm, Ruger & Co.,* No. 4502586/00, 8/17/2001 N.Y.L.J. 18 (N.Y. Sup. Ct. Aug. 10, 2001) (while not rejecting the possibility of a successful public nuisance action based on the manufacture and sale of firearms, dismissing the State of New York's claims on the grounds that the State had failed

31

to adequately allege that the defendants were responsible for creating or maintaining a public nuisance under either the common law or New York Penal Law 240.45).

There is nothing remarkable in the results in *Beretta* and *Acusport*. In accordance with the standard meaning of "applicable," New York courts have repeatedly held that the common law doctrine of public nuisance is "applicable to" the sale or marketing of legal but potentially harmful products. *See In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 379 F. Supp. 2d 348 (S.D.N.Y. 2005) (upholding public nuisance claims for legal gasoline additives under several states' laws, including New York State law); *United States v. Hooker Chemicals & Plastics Corp.*, 748 F. Supp. 67 (W.D.N.Y. 1990) (state could maintain a common law public nuisance action against Occidental Chemical Company regarding the creation of "the public health and environmental disaster at Love Canal"); *Sturm, Ruger & Co.*, No. 4502586/00, 8/17/2001 N.Y.L.J. 18, slip op. at 10 (rejecting defendants contention that the "lawful manufacture and sale of non-defective products cannot constitute a public nuisance"); *State v. Fermenta AZC Corp.*, 160 Misc. 2d 187 (N.Y. Sup. Ct. 1994) (factual question existed as to whether registrant for herbicide was liable for the creation of a public nuisance); *State v. Schenectady Chemicals, Inc.* 459 N.Y.S2d 971 (Sup. Ct. Rensselaer Cty. 1983) (state could maintain a common law nuisance action to compel a chemical company to pay the costs of cleaning up a dump site). These cases establish that the common law equivalent of New York PL 240.45 is "applicable to," *i.e.,* "capable of being applied to," the sale and marketing of legal gasoline additives, chemicals, and herbicides. Neither the common law doctrine of public nuisance nor New York PL 240.45 are any less "applicable to" the sale and marketing of firearms than they are to other legal but potentially dangerous products.

Defendants argue that the predicate exception must be read narrowly and that, as so read,

32

the City's action does not fall under it. According to the defendants, two canons of statutory interpretation—"*noscitur a sociis*" and "*ejusdem generis*"—require this result. *See* Defs.' Reply 12-13. Under these principles, "[t]he meaning of one term may be determined by reference to the terms it is associated with, and where specific words follow a general word, the specific words restrict application of the general term to things that are similar to those enumerated." *Gen. Elec. Co. v. Occupational Safety & Health Review Comm'n.*, 583 F.2d 61, 65 (2d Cir. 1978).

As already noted, defendants rely upon the fact that the predicate exception is followed by two narrow examples of statutory violations that trigger it. Section 4(5)(A)(iii)(I) provides that the predicate exception applies in "any case in which the manufacturer or seller knowingly made any false entry in, or failed to make appropriate entry in, any record required to be kept under Federal or State law with respect to [firearms], or aided, abetted, or conspired with any person in making any false . . . statement with respect to any fact material to the lawfulness of the . . . disposition of a [firearm]." Section 4(5)(A)(iii)(II) states that the exception applies in "any case in which the manufacturer or seller aided, abetted, or conspired with any other person to. . . dispose of a [firearm], knowing or having reasonable cause to believe, that the actual buyer. . . was prohibited from possessing or receiving a firearm or ammunition under subsection (g) or (n) of section 922 of title 18, United States Code." Because both of these examples involve violations of statutes specifically regulating the manner in which firearms are sold or marketed, defendants maintain that the principles of *ejusdem generis* and *noscitur a sociis* dictate that the predicate exception itself be limited to statutes of this sort. *See* Defs.' Reply 13.

Defendants' reliance on statutory canons is misplaced. The language of section 4(5)(a)(iii) is "clear, broad, and unqualified." *Norfolk & W. Ry. Co. v. Am. Train Dispatchers'*

33

*Ass'n*, 499 U.S. 117, 128 (1991). It does not admit of the distinction defendants ask the court to draw, between laws *specifically* regulating the sale or marketing of firearms and laws that, while "applicable" to the sale or marketing of firearms, do not explicitly mention firearms in their text. While "[t]he meaning of particular phrases must be determined in context," *Securities & Exch. Comm'n v. Nat'l Sec., Inc.*, 393 U.S. 453, 466 (1969), the canons of construction cannot be used to avoid plain meaning. *U.S. v. Turkette*, 452 U.S. 576, 582 (1981) ("The rule of *ejusdem generis* is no more than an aid to construction and comes into play only when there is some uncertainty as to the meaning of a particular clause in a statute."); *Harrison v. P.P.G. Indus., Inc.*, 446 U.S. 578, 588 (1980) ("the rule of *ejusdem generis* is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty. . ."); *U.S. v. Powell*, 423 U.S. 87, 91 (1975) ("The rule of *ejusdem generis*, while firmly established, is only an instrumentality for ascertaining the correct meaning of words when there is uncertainty."); *Gooch v. U.S.*, 297 U.S. 124, 128 (1936) (same).

If Congress had wanted to limit the predicate exception to statutes almost identical to the two examples, it could easily have done so. It did not. Rather than excepting those actions in which a manufacturer or seller knowingly violated a state or federal statute "directly" or "specifically" regulating the sale or marketing of firearms, Congress excepted all actions "in which a manufacturer or seller . . . knowingly violated a State or Federal statute applicable to the sale or marketing of [firearms]." PLCAA § 4(5)(A)(iii).

### b.    Power of Courts to Interpret Laws

At oral argument, defendants emphasized their position concerning the scope of the word "applicable" as used in the predicate exception. *See* Tr. of Arguments of November 21, 2005 9-

34

20. It is defendants' contention that, in order to be a "statute applicable to the sale or marketing of [firearms]," the state statute has to explicitly mention firearms; it is not enough that the statute could be construed by state (or federal) courts to include firearms, or even that the highest state court had so construed the statute: the statute must mention the word "firearms" or "guns" or the like. Even were the question of the meaning of New York PL 240.45 to be certified to the New York Court of Appeals and were it to rule explicitly that 240.45 includes firearm merchandising, it could not, defendants contend, comply with the Act—only an explicit state statute could do so.

The oral argument on the motion to dismiss reads in part as follows:

> THE COURT: Your position is that even if the Court of Appeals of the State of New York said in a holding that this statute [New York PL 240.45] applies to straw sales, it would have no bearing on the meaning of the statute in connection with this state law; is that it?

> MR RICE: Yes, your Honor.

> ...

> THE COURT: If the New York statute [New York PL 240.45] specifically referred to firearms or to straw sales or to both, what would your position be?

> MR RICE: Clearly, I think, your Honor, the statute that the act passed by Congress contemplates is a state statute applicable to the sale or marketing of a firearm as well and I suppose requires seeing the actual language that was in the statute, but if there was legislation in the state that dealt with the sale or marketing of a firearm, as I understand your Honor is suggesting, then I certainly think that can come within the exception. It is obviously not the

case here. We have a statute, general applicability—

THE COURT: I don't understand why you suggest that the New York Court of Appeals can't construe its own statutes to put in the words, if that's what the meaning attributed to the statute is going to be, this includes straw sales and sale of handguns. Why is the New York Court of Appeals limited in its power to construe a state statute?

MR. RICE: Your Honor, the New York Court of Appeals—let me be clear—is not limited in construing its statute, but it is limited. The way it construes its statute does not control whether or not that statute is one that the United States Congress defined as a federal or state statute applicable to the sale or marketing of firearms. When it defined that and you look at the exception that has the two examples that it gives, it is talking about statutes and regulations of a particular kind that deal with the manner in which firearms are sold and to whom they are sold.

...

THE COURT: I just want to get this clear. We have an interesting federalism problem here. A federal statute which depends, as you suggest, on a state statute, and, as I understand your argument, it is the state statute that has to use []—I'll call them magical terms for discussion purposes—"straw sale of handguns" or something like that; it is not enough if there is a statute that the New York Court of Appeals has construed as meaning these quasi magical terms, right?

MR RICE: It is—if I understand what the Court is saying, I think that's right, but again it is not—what we're saying that the . . .

36

New York Court of Appeals is doing and what Congress has done are two separate things. Congress has said the following state and federal statutes are by definition what the exception [covers]. They are the ones that are applicable to the sale or marketing of firearms. By that we mean, by example, theses two sections and the fact that the New York Court of Appeals could at some point turn around and say that 240—

THE COURT: No, no. Supposing it had said it in the past.

MR. RICE: Supposing it had said it in the past, that the criminal nuisance statute of general applicability could—

THE COURT: No. They had a case and they said we hold it includes straw sales in handgun violations and negligence in handgun sales. Supposing we had a New York Court of Appeals holding on the books, is it your position that that holding would not come within the exception?

...

MR RICE: My position is—I'll try it again. My position is there is a fundamental difference. I understand what the New York Court of Appeals has said under your Honor's—under the decision the Court refers to. The New York Court of Appeals has said that the straw purchases and violations of the law that occurred come within the terms of the criminal nuisance statute, that those violations have created a criminal nuisance and that is— and the defendants are subject to liability or subject to being charged under the criminal nuisance statute. With that understanding, again, I do not believe that the holding by the New York Court of Appeals converts the criminal nuisance statute itself into a statute

applicable to the sale or marketing of a product.

         ...

> THE COURT: You don't doubt the position that the
> characterization within the statute is a federal issue, right?
>
> MR. RICE: Yes.
>
> THE COURT: Federal court, national issue, but it is a different
> step to say that the federal courts must ignore a state court
> interpretation of its statute which makes the statute the exact
> equivalent of a statute which expressed literally and in terms these
> words you say are required.

Tr. of Argument of November 21, 2005 11, 14-15, 16-19.

The defendants' argument misconstrues the relationship of courts and the legislature in New York. The law is not only the language that the legislature adopts, but what the courts construe to be its meaning in individual cases. *See, e.g.*, N.Y. Const. art. 6, § 1 (unified court system); N.Y. Const. art. 6, § 2 (jurisdiction of Court of Appeals); N.Y. C.P.L.R. § 103 (form of civil judicial proceedings).

The United States Constitution "guarantees" each state a "Republican Form of Government." U.S. Const. art. IV, § 4. And it requires state judges to "be bound thereby." U.S. Const. art. VI, ¶¶ 3-4. Our form of federal and state governments provides for a separation of powers with cooperation by legislatures and courts. It does not give the federal government unlimited authority to transfer state court power to state legislatures or to abolish traditional court powers to construe the meaning of legislation. *See* The Federalist No. 78 (Alexander Hamilton) ("[A]s liberty can have nothing to fear from the judiciary alone, but would have every

thing to fear from its union with either of the other departments; that as all the effects of such a union must ensue from a dependence of the former on the latter, not withstanding a nominal and apparent separation; that as, from the natural feebleness of the judiciary, it is in continual jeopardy of being overpowered, awed, or influenced by its co-ordinate branches, [jeopardizing its position] as the citadel of the public justice and the public security.") *Cf. infra* Part IV.D.4 (discussing power of courts to avoid interference by legislature with adjudicative functions).

### c.     Legislative History

Both the plaintiff and the defendants rely heavily on the legislative history of the Act to support their different conclusions about the scope of the predicate exception. The City points to the statements of congressional sponsors that indicate that the Act was not intended to grant "automatic immunity" to gun makers and sellers. As its initial sponsor and floor leader stated in the Senate:

> This is not a gun industry immunity bill. . . . This bill does not create a legal shield for anybody who manufacturers or sells a firearm. It does not protect members of the gun industry from every lawsuit or legal action that could be filed against them. It does not prevent them from being sued for their own misconduct.

151 Cong. Rec. S. 9087, 9088 (daily ed. July 27, 2005) (Sen. Craig).

> It is not a gun industry immunity bill because it does not protect firearms or ammunition manufacturers, sellers, or trade associations from any other lawsuits based on their own negligence or criminal conduct.

151 Cong. Rec. S. 9059, 9061 (daily ed. July 27, 2005) (Sen. Craig).

> It is not the gun industry immunity bill. It is important that we say

39

> that and say it again because it does not protect firearms or
> ammunitions manufacturers, sellers or trade associations from any
> lawsuits based on their own negligence or criminal conduct. This
> bill gives specific examples of lawsuits not prohibited. Let me
> repeat, not prohibited: Product liability . . .Negligence or negligent
> entrustment, breach of contract, lawsuits based on a violation of
> State and Federal law, it is very straightforward, and we think it is
> very clear.

*Id.* at S. 9065.

> What all these nonprohibited lawsuits have in common is that they
> involve actual misconduct or wrongful actions of some sort by a
> gun manufacturer, a seller or a trade association. Whether you
> support or oppose the bill, I think you can all agree that individuals
> should not be shielded from the legal repercussions of their own
> lawless acts.

151 Cong. Rec. S. 9087, 9089 (daily ed. July 27, 2005) (Sen. Craig). *See also id.* at S. 9107

(Sen. Baucus) (explaining that the PLCAA "will not shield the industry from its own

wrongdoing or from its negligence"); 151 Cong. Rec. S. 9374, 9395 (daily ed. July 29, 2005)

(Sen. Craig) ("This bill will not prevent a single victim from obtaining relief for wrongs done to

them by anyone in the gun industry.").

     Senator Craig's statement were similar when supporting S. 1805, a virtually identical bill

that failed to pass in the 108th Congress:

> What this bill does not do is as important as what it does. This is
> not a gun industry immunity bill. This bill does not create a legal
> shield for anyone who manufactures or sell firearms. It does not
> protect members of the gun industry from every lawsuit or legal
> action that could be filed against them. It does not prevent them

> from being sued for their own misconduct. Let me repeat that. It
> does not prevent them—"them," the gun industry—from being
> sued for their own misconduct. This bill only stops one extremely
> narrow category of lawsuits: lawsuits that attempt to force the gun
> industry to pay for the crimes of third parties over whom they have
> no control.

150 Cong. Rec. S. 1860, 1862 (daily ed. Feb. 27, 2004) (Sen. Craig).

Defendants rely upon statements emphasizing concern about the "huge costs" borne by

defendant gun manufacturers and sellers. As Senator Sessions contended:

> Huge costs arise from simply defending an unjust lawsuit. Indeed,
> such lawsuits, even if lacking any merit and ultimately
> unsuccessful, can deplete an industry's resources and depress stock
> prices. Defendant industries must hire expensive attorneys and
> have their employees spending countless hours responding to the
> lawyers, providing them information and so forth, and meeting
> with them.

151 Cong. Rec. S. 8908, 8910 (daily ed. July 26, 2005) (Sen. Sessions).

Sponsoring Senator Baucus reiterated his colleague's concerns:

> [T]he time, expense, and effort that goes into defending these
> nuisance suits is a significant drain on the firearms industry,
> costing jobs and millions of dollars, increasing business operating
> costs, including sky-rocketing insurance costs, and threatening to
> put dealers and manufacturers out of business. That is why this
> bill is so necessary.

151 Cong. Rec. S. 9087, 9107 (daily ed. July 27, 2005) (Sen. Baucus); *see also* 151 Cong. Rec.

S. 8908, 8910 (daily ed. July 26, 2005) (Sen. Sessions) (discussing his fears for the future of

hunting in his home state of Alabama if the gun industry were to be "ruin[ed]"). *But cf.* 151

41

Cong. Rec. S. 8908, 8913-14 (daily ed. July 26, 2005) (Sen. Reed) (finding little basis in fact for the claims of excessive litigation costs to the gun industry).

None of the legislative history cited by the parties answers the present question of statutory interpretation. No one contests what these quotations confirm. It is clear that Congress did not intend to establish automatic immunity to gun manufacturers or sellers. However, the fact that Congress did not intend to grant automatic immunity does not mean that it specifically intended the predicate exception to apply in this case. Likewise, members of Congress were certainly concerned about the high costs of "unjust" or "predatory" lawsuits. But this concern does not make the present litigation an example of a prohibited suit under the Act. What is decisive is the language of the Act itself.

### 4. Requirement of an Action "in Which" a Manufacturer or Seller Violated a State or Federal Statute

#### a. Time When Exception is to be Applied

The Act does not specify when in the course of a pending action a court is to determine that an action is a "qualified civil liability action." *See* PLCAA § 3(b). When a filed action on its face appears to be an action against a firearm manufacturer or seller for relief from the criminal or unlawful misuse of a firearm by a third party (*i.e.,* a qualified civil liability action), but the plaintiff asserts that it is "an action in which a manufacturer or seller . . . knowingly violated a State or Federal statute applicable to the sale or marketing of [firearms]," that dispute must be resolved before dismissing the action as a "qualified civil liability action." This follows from the design of the statute: if the action is the latter (involving a state or federal statutory violation), it is not the former (a qualified civil liability action), and cannot be dismissed.

42

Nothing in the language of the Act suggests that a court can address the issue other than under the Federal Rules of Civil Procedure. If the case can come within the predicate exception, the matter is only resolvable pre-trial by a motion for summary judgment under Rule 56(b) or by trial. This conclusion follows because there is no requirement in the Act that violation of the predicate statute be proven prior to the commencement of the putative qualified civil liability action. So long as the City has alleged facts sufficient to establish that the predicate exception applies to its case, the instant action cannot be dismissed prior to trial as a "qualified civil liability action." Whether or not the present litigation *is* a "qualified civil liability action" depends on questions of fact that are currently disputed and must be resolved by trial.

### b. Lack of Need for Prior Decision that New York PL 240.45 was Violated

To sufficiently plead the predicate exception, the pleader need only allege a knowing violation of a predicate statute, and need not offer up evidence of a judgment or completed prosecution. A prior judicial act is not a prerequisite to the applicability of the predicate exception. This conclusion is dictated by the Act's requirement of a "violation" of a state or federal statute and confirmed by the operation of other federal statutes that operate by means of predicate violations.

An instructive federal statutory cause of action dependent upon a predicate violation is the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962 *et seq.*, requiring violations of specified state or federal crimes as an element of a RICO claim. Shortly after RICO was enacted, courts analyzed the statutory language to determine whether a cause of action under the statute required only allegations of predicate violations (followed by subsequent

43

proof in the action itself) or, instead, whether the predicate had to have been proven as a prerequisite to the RICO claim. The Court of Appeals for the Second Circuit, for example, looked to the description of the predicates as "violations" "chargeable" under state law and concluded that Congress intended the RICO predicates to be criminal convictions: "RICO liability simply does not exist without criminal conduct .... [I]n a civil context, there is no way to know whether the conduct in question is 'already criminal' . . . We conclude that had Congress considered this problem, it would have explicitly required previously established convictions." *Sedima, S.P.R.L. v. Imrex Co.*, 741 F.2d 482, 501 (2d Cir. 1984), *rev'd*, 473 U.S. 479 (1985).

The Supreme Court rejected the view of the Court of Appeals for the Second Circuit, observing that "[t]he Court of Appeals purported to discover its prior-conviction requirement in the term 'violation' in § 1964(c)." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 488 (1985). But, the Court concluded, "the term 'violation' does not imply a criminal conviction. *It refers only to a failure to adhere to legal requirements.*" *Id.* at 489 (emphasis added) (internal citations omitted). Thus, a civil RICO plaintiff may proceed against a defendant without a prior criminal conviction. *Id.* at 493.

A similar view has been taken of the Lacey Act, 16 U.S.C. § 3372, which outlaws conduct "*in violation of* any law or regulation of any State or in violation of any foreign law." (Emphasis added.) That language has not been interpreted to require a prior judicial determination about the conduct constituting the predicate offense. Instead, it contemplates proof of the conduct as an element of the Lacey Act prosecution itself. *See, e.g., United States v. McNab*, 324 F.3d 1266 (11th Cir. 2003) (trial court instructed jury on Honduran law necessary for conviction); *United States v. Fountain*, 277 F.3d 714 (5th Cir. 2001) (government proved violations of state law, thereby proving Lacey Act violation).

44

The operation of RICO and Lacey and of the Act itself depends upon the ordinary meaning of the term "violation," that is to say, "act[ing] against the dictates or requirements of oath, treaty, law terms or conscience." The Concise Oxford Dictionary 1453 (5th ed. 1964). *See also* Black's Law Dictionary 1600-01 (8th ed. 1999) (defining "violation" as "the act of breaking or dishonoring the law"); Oxford American Dictionary and Language Guide 1129 (1999) (defining "violate" as to "disregard; fail to comply with"); Webster's Third New International Dictionary 2554 (1993) (defining "violate" as "to "break" or "disregard" and "violation" as "the act or action of violating; an infringement or transgression"). In short, a "violation" is the conduct itself, not that conduct accompanied by some judicial finding, such as a judgment.

A difference in the language used in the three exceptions to the Act's section 4(5)(A) support the conclusion that the predicate exception is part of the necessary proof, not a prerequisite. Significantly, section 4(5)(A)(i), the first of the three types of cases that are not "qualified civil liability actions," is: "(i) an action brought against a transferor *convicted* under section 924(h) of title 18, United States Code, or a comparable or identical State felony law, by a party directly harmed by the conduct *of which the transferee is so convicted . . .*" (Emphasis added.) When Congress wished to require a conviction it so stated explicitly.

By contrast, in the predicate exception, Congress was content to use the word "violation," rather than "conviction." Furthermore, unlike the language introducing the two other exceptions, 4(5)(A)(i) and (ii), which refer to an "action brought," PLCAA § 4(5)(A)(iii)— the provision relied on by the City—defines the excepted "action" as "an action *in which* ..." The meaning of actions "in which" certain facts exist is that the facts need only exist "in" those actions, not that they have already been found to exist in a prior action.

### c. Adequacy of the Complaint to Raise Exception Issue

To establish that the action at bar is not a "qualified civil liability action" because it is within the predicate exception, the City must allege and ultimately prove both that the defendants have knowingly "failed to adhere" to the requirements of New York PL 240.45, *see Sedima*, 473 U.S. at 489 (defining "violation" as a "failure to adhere to legal requirements"), and that the defendants' violation of that statute is the proximate cause of the harm for which the City seeks relief. *See* PLCAA § 4(5)(A)(iii). The Act does not designate which party must assume the burden of proof on this issue. For purposes of this motion, the City has assumed the burden of demonstrating that the complaint's allegations bring the complaint within the predicate exception. *See* Pl.'s First Mem. in Opp. 14 n.8.

The City's complaint alleges facts sufficient to establish a knowing violation of New York PL 240.45. The violation consists of three elements: 1) the existence of a public nuisance (*i.e.*, a condition "endanger[ing] the safety or health of a considerable number of persons"); that is 2) caused or maintained by the defendants' unlawful or unreasonable conduct; and 3) defendants' knowledge or reckless disregard of the fact that the conduct causes the nuisance.

The complaint alleges that "[a] public nuisance exists in New York in the form of widespread access to illegal firearms, causing harm to the population at large by endangering and injuring the lives, property, health, safety or comfort of a considerable number of persons." Compl. ¶ 2. This sufficiently alleges the first element of New York PL 240.45.

The complaint further alleges that the diversion of firearms into the illegal market "is a result of defendants' failure to institute appropriate marketing and distribution practices," Compl. ¶ 5, and that "[r]easonable measures are available to ensure that the guns sold and distributed by defendants do not find their way into a secondary illegal market." Compl. ¶ 7A.

46

In the nuisance context, for purposes of the present motion, a determination that conduct is unreasonable under the circumstances "depends upon whether the gravity of the harm to B is great enough to outweigh the utility of A's conduct" in operating its business in the manner that gives rise to the nuisance. Restatement 2d of Torts ¶ 830. The gravity of the harm alleged by the City—"[a] public nuisance. . . in the form of widespread access to illegal firearms, . . . endangering and injuring the lives, property, health, safety or comfort of a considerable number of persons"—may very well be found to outweigh the utility of the defendants' conduct in operating their businesses as they do. *See NAACP v. Acusport*, 271 F. Supp. 2d 435, 446 (E.D.N.Y. 2003) ("The evidence presented at trial demonstrated that defendants are responsible for the creation of a public nuisance and could—voluntarily and through easily implemented changes in marketing and more discriminating control of the sales practices of those to whom they sell their guns—substantially reduce the harm occasioned by the diversion of guns to the illegal market and by the criminal possession and use of those guns."). The City's allegations regarding the defendants' conduct satisfy the second element of New York PL 240.45, requiring that the nuisance be caused or maintained by the defendants' unreasonable conduct.

Finally, the complaint alleges that the "[d]efendants have reason to know or should know that (i) some of the firearms they manufacture and/or distribute will be diverted into the hands of those who would violate the law, and (ii) they could take steps to reduce the number of firearms that fall into the hands of criminals by changing their merchandising practices." Compl. ¶ 6. It also alleges that the "[d]efendants, through their sales, marketing and distribution practices, have *knowingly* created, supplied, maintained and contributed to an illegitimate market for guns through which criminals, juveniles, and other prohibited users obtain guns that are thereafter used in criminal activity in the City of New York." Compl. ¶ 117 (emphasis added). This

47

sufficiently alleges the third element of New York PL 240.45, requiring that the defendants have knowledge of the fact that their conduct causes the nuisance.

Since New York PL 240.45 is essentially a criminal codification of the common law doctrine of public nuisance, the same conduct which the City alleges causes the public nuisance for which it seeks relief—"defendants' failure to institute appropriate marketing and distribution practices," Compl. ¶ 5—comprises an element of the statutory violation, "conduct that is unreasonable under all the circumstances." Because New York PL 240.45 is violated by the same conduct that gives rise to a common law nuisance, the City's complaint sufficiently alleges the proximate cause requirement of section 4(5)(A)(iii).

## C.     Conclusion as to the Applicability of the Act

The Act does not require dismissal of the City's action.

# IV. Constitutionality of Act

## A.     Introduction

The City contends the Act would be unconstitutional if applied as defendants propose to bar the litigation. *See* Pl.'s Second Mem. in Opp. 19-59. Defendants and the United States both contend that the Act is constitutional. *See* Defs.' Reply 14-48; U.S. Br. 3-38. The parties' arguments on this issue run the constitutional gamut from federalism and the separation of powers through due process, equal protection, the First Amendment, and beyond.

Although the parties have delved widely into current constitutional doctrine, two relatively simple concepts define the dispute and provide a basis for decision. First: It is Congress that decides how to resolve differences among the states and its regions. Here it has

48

arguably done so rationally to favor the needs of the Gun Industry and populations favoring handguns over the needs of the country's major cities. Second: The City is not claiming damages for a violation of a vested right. It seeks only an injunction against future possible violations of state law. No issue of a violation of substantive rights, procedural due process or equal protection of the laws has been raised because no existing entitlement is sought to be redeemed by this litigation.

While the variety of other constitutional issues raised directly and indirectly by the parties and discussed below are in some instances not critical to the decision, together they lend color to the picture of the case's constitutional background.

There is no violation of the United States Constitution. Were the Act to be interpreted as ousting all courts—state and federal—of jurisdiction in the present circumstances, it would in effect be changing both procedural-jurisdictional and substantive law. Congress would not be exceeding its constitutional power by doing so in the Act as applied to the present case. No ruling is made on whether a different jurisdiction-ousting statute would pass constitutional muster.

## B.   Regional Conflicts

### 1.   History

From the beginning, the country's leaders recognized that each region of this widely dispersed and heterogeneous land has different needs and different views. One of the fundamental reasons The People adopted the constitution was to provide a system for resolving those different needs and views peacefully, primarily through the national legislature. It was understood by the leaders as well as by the ratifying voters that there would be regional and

group differences that had to be mediated by the federal government if the nation were not to break apart. *See, e.g.,* The Federalist Nos. 6, 7, 8, 9 (Alexander Hamilton), No. 10 (James Madison); Carl Van Doren, *Introduction* to The Federalist v, xi (Limited Ed. Club 1945) (describing "a time when serious Americans could prefer to see the newly independent states ... become a number of regional confederations"); Walter R. Borneman, 1812: The War that Forged a Nation 42 (2004) (describing differences between Western hawks seeking conquest of Canada and Northeastern merchants concerned with peaceful trade on the high seas); Eric Foner, Reconstruction: America's Unfinished Revolution: 1863-1877 311 (Francis Parkman ed. 2005) (to the widely conflicting views of Northerners and Southerners was added the conflict between Western farmers' demands for paper currency inflation and Eastern bankers' insistence on hard currency based on gold); John P. Kaminski, *The Empire State: The Antifederalist and Federalist Perspectives*, 1 N.Y. Legal Hist. 147, 148 (2005) (describing New Yorkers' resentments that no one supported them against Vermont's revolt, helped against British occupation, or paid as much as New York to support the national government; one state paid nothing to the Confederation Congress). *But see* Eric Foner, *Richard Hofstadter: Columbia's Evolutionary Historian*, Columbia, Fall 2005, at 39 ("[Richard] Hofstadter's insight [was] that his subjects held essentially the same beliefs. Instead of persistent conflict between agrarians and industrialists, capital and labor, or Democrats and Republicans, broad agreement on fundamentals, particularly the values of individual liberty, private property, and capitalist enterprise, marked American history."). That system of regional conflict resolution has worked during the "First Republic's" pro- and anti- slavery periods (until it broke down in Lincoln's era); during pro- and anti- tariff industrial and agrarian conflicts in the post-Civil War "Second Republic;" during the poorer versus the richer times of the "Third Republic" under Franklin Roosevelt; and during the period

50